**EASTER HOUSE, An Illinois Not-For-Profit Corporation**

v.

**The UNITED STATES.**

No. 265–86T.

United States Claims Court.

June 10, 1987.

Robert H. Kapp, Washington, D.C., atty. of record, for plaintiff.

Neil V. Birkhoff, Washington, D.C., with whom was Asst. Atty. Gen. Roger M. Olsen, atty. of record, for defendant. Mildred L. Seidman and W.C. Rapp, of counsel.

---

1. Unless otherwise indicated, statutory section references are to 26 U.S.C. (the Internal Revenue Code of 1954, as amended).

## OPINION

LYDON, Judge:

This is an action for a declaratory judgment pursuant to 26 U.S.C. § 7428 (1982) (Section 7428 of the Internal Revenue Code of 1954, as amended)[1]. In its complaint plaintiff seeks a declaration that it qualifies as an organization described in section 501(c)(3) and therefore is exempt from taxation pursuant to section 501(a). After careful consideration of the parties' briefs and other submissions, review of the certified administrative record, and oral argument, the court finds plaintiff is not entitled to the relief it requests for the reasons set forth below.

### Facts

Plaintiff, Easter House, is an "Illinois Not-For-Profit Corporation". It was originally incorporated on May 5, 1960. Since 1962, plaintiff has been licensed by the state of Illinois to operate as an adoption agency. On December 12, 1983, plaintiff's attorney sent a letter and an Internal Revenue Service (IRS) form 1023, "Application for Recognition of Exemption" by which plaintiff sought a determination letter from the IRS recognizing plaintiff as an organization described in section 501(c)(3). On June 7, 1985, after much communication between plaintiff and the IRS, a proposed ruling denying plaintiff's application was issued by the IRS. By letter dated July 2, 1985, plaintiff, through its attorneys, protested the proposed ruling. This letter was supplemented with letters dated September 26, 1985 and November 11, 1985, both of which included several attachments. On February 5, 1986 the IRS issued a final adverse ruling as to plaintiff's tax exempt status. See sections 501(a) and 501(c)(3). On April 25, 1986 plaintiff filed suit in this court, seeking the above described declaratory judgment.

Plaintiff describes its activities as a "continuum" which starts with its provision of prenatal care for pregnant women and continues through the delivery of the baby to

the ultimate goal of placing the child with adoptive parents. This process begins with plaintiff's search for pregnant women. It places advertisements in the yellow pages for telephone use in metropolitan Chicago and other cities in Illinois directed at "mothers-in-need." [2] At one time plaintiff contemplated newspaper advertising but had no plans to do so as of 1984 or 1985. However, in its letter of August 14, 1984 (or August 15, 1984) to the IRS describing its activities, plaintiff advised that the general public was notified of the availability of its services "primarily through yellow pages and newspaper advertising * * *." In some instances, women are referred to plaintiff by professionals such as doctors and social workers, and in other instances "word-of-mouth" produced "mothers-in-need".

Contact with plaintiff is usually initiated by a woman with an unwanted pregnancy. A woman's first contact with plaintiff is through one of its social workers who counsels the woman as to her various options concerning her pregnancy. If the woman decides to carry her baby to term, and then place it up for adoption through plaintiff, one of plaintiff's case workers meets with the woman to determine if and how much medical, housing and other financial help the woman will need. It is important to note that plaintiff provides services beyond initial counseling to the woman only if she is going to put her child up for adoption through plaintiff and demonstrates a financial need for such services. Plaintiff does not provide financial support or services to biological parents or mothers-to-be who already have access to such services or the financial means to obtain such services. Plaintiff investigates the financial means of the mother-to-be to see if she is eligible for insurance (medical, health, hospital) and whether financial support is available from family or other sources. In 1984, 86 percent of those women who had an initial counseling with one of plaintiff's case workers received monetary assistance of some kind from plaintiff. The vast majority of these women were unwed and unemployed.

Generally, medical expenses of the biological mother who decides later not to place her child up for adoption through plaintiff are direct obligations of said mother. In some circumstances, however, plaintiff has voluntarily, or by prior agreement, paid medical expenses of a biological mother who did not place a child for adoption through plaintiff. The record does not indicate the amount of such voluntary expenditures.

Plaintiff provides a comprehensive group of services for mothers-to-be who intended to place their newborns for adoption through plaintiff. These services include: (1) facilitating and financing health and medical care; (2) nutritional counseling; (3) referrals to other social welfare agencies; (4) housing during pregnancy; (5) financial assistance for food and clothing; (6) delivery room non-medical assistance; (7) emotional support during pregnancy; (8) post-delivery counseling; and (9) foster care of the child from the time of delivery until the child is placed with the adoptive parents. These services are all provided to help ensure the health of the child.

The child's health is important to plaintiff because it can charge the adoptive parents the full adoption fee for a healthy baby. If an unhealthy baby is born, plaintiff might not be able to place the child with adoptive parents. Additionally plaintiff encounters medical expenses when it has an unhealthy child it cannot place. In some instances, plaintiff has charged a reduced fee for those children who are difficult to place because of age, health, race or "similar circumstances." Plaintiff emphasizes to those interested in its adoption services the prenatal care it provides the mothers and the resulting quality of the children they deliver.

In 1985 the total fee charged by plaintiff for placing a child with adoptive parents was $16,500.[3] All prospective parents are

---

2. In 1982 plaintiff spent $43,000 on advertising. In 1983 plaintiff spent $34,000 on advertising.

3. Plaintiff's first placement fee charged adoptive parents was $50.00. This fee increased over the years from $1,500 to $2,500 to $5,000 by 1974.

charged an "initial service fee" of $1,500. This fee, usually nonrefundable[4] was termed "regrettable" by the Illinois Department of Children and Family Services. This initial service fee is for plaintiff's investigation of the prospective parents and plaintiff's "home-study" course for the prospective parents. This investigation focuses, *inter alia,* on the educational and financial status and ability to pay of the adoptive parents. Plaintiff obtains the recent income tax returns of applicants for children to verify their income status and inquiry is made into their total assets and liabilities.

The adoption placement fee, as indicated previously, was increased to $15,000 in 1985. This figure represented a $7,000 increase from the fee of $8,000 charged by plaintiff in 1981.[5] The record does not show that plaintiff experienced an 87.5 percent increase in expenses relative to said fee increase during this period.

One result of plaintiff's fee structure was to put its adoption service beyond the reach of a sizeable segment of the population. Thus, qualified applicants who cannot afford to pay $16,500 are unable to adopt through plaintiff or, at best, reduced to taking a problem placement at a lower placement fee.

Plaintiff concedes that in most cases the fees paid by the adoptive parents more than cover the costs of the services it provided mother, child and adoptive parents. Although plaintiff has represented otherwise, the record clearly indicates that prospective adoptive parents are informed by plaintiff in the information literature furnished to them, that they are responsible for all legal expenses relative to the adoption process.

The fees charged adoptive parents are plaintiff's sole source of income. Plaintiff states it depends upon these fees to perform its services to mother, child and adoptive parents. It neither solicits nor receives contributions. Plaintiff neither receives nor seeks funding from state or federal government sources. Plaintiff claims that its fee system is not designed to produce a profit (over the costs of providing the services and maintaining a "reasonable reserve"). For the calendar year 1983 plaintiff had a "total service income" of $1,032,575 and net income of $257,338.78, a profit margin of approximately 25 percent.

The dominant influence in plaintiff's affairs is Seymour Kurtz (Kurtz), its president and only "life member."[6] The life member elects every other member of the corporation. Kurtz is also one of plaintiff's directors. He had no active role as an officer until 1974. In 1962 and 1963 Kurtz, as attorney, provided some legal services for plaintiff and received approximately $2,000 in fees for these services. In 1973 Kurtz became one of plaintiff's directors. At this time, i.e., 1973, plaintiff was considering closing down because of the shortage of children available for adoption. Kurtz became president of plaintiff in 1974. During the period 1974–1977, the plaintiff's

---

In the decade following 1974, the fee rose from $5,000 to $14,000 (1983) to $15,000 (1984). The placement fees are paid at the time the child is permanently adopted. In contrast, the initial service fee of $1,500 is paid "up front". Adoptive parents are also responsible for their attorney's fees and costs in processing the adoption through the courts.

4. If adoptive parents maintain their "qualified" status for 9 months and plaintiff is unable to place a child with them, their initial service fee will be refunded. If, however, such applicants later receive a child for adoption, then the initial service fee together with the placement fee must be paid to plaintiff. The initial service fee is forfeited to plaintiff by applicants who do not qualify as adoptive parents under a letter agreement with plaintiff. Additionally, plaintiff's re-

cent policy has been to refund the initial service fee of those couples who are not yet ready to adopt, but might be in the future. These latter applicants are generally young people who are really not ready to adopt a child but might be ready to do so at a future time. Plaintiff felt an initial service fee refund in such cases might encourage such young parents to continue their desire to adopt a child from plaintiff.

5. In 1981 the initial service fee was $800. It rose to $1,500 in 1982 and, according to the record, has remained at that level.

6. According to plaintiff's by-laws there are two classes of members, "life members" and "members". The "president or life member" may call a special meeting of members.

activities were minimal and they placed only a few children for adoption. As the only life member Kurtz elects and qualifies all of the other directors. On its IRS form 1023, plaintiff lists five other directors in addition to Kurtz.

As the sole life member of plaintiff, Kurtz enjoyed many powers. Only the life member can recommend the expulsion or suspension of another member (for or without cause). Only the life membership is transferable by inter vivos or testamentary instrument. No other membership is transferable. The life member decides what corporate affairs will be managed by the board of directors and what corporate affairs will be managed by the life member. The life member has the power, even without a board of directors' resolution, to enter into contracts and execute drafts, notes and other forms of indebtedness on plaintiff's behalf. For Kurtz's services in 1983, he received a salary of $45,125.05. In 1982, Kurtz received a salary of $32,000.

Kurtz was associated with three other child welfare organizations at times material herein. He was a compensated officer[7] of Friends of Children, Inc. (Friends), a Georgia not-for-profit agency which provided services similar to the ones provided by plaintiff. Plaintiff and Friends shared a common principal director—Margot Hamilton. Kurtz was also an officer of Tzyril Foundation (Tzyril), a not-for-profit organization established to coordinate adoptions of foreign children by parents in the United States. Tzyril began its operations in the mid–1970's and ceased activity in 1982. Finally, Kurtz was the sole owner and "wholly controlled" Suko Corporation (Suko), a for-profit corporation established to provide legal services for adoption of Latin American children. At times pertinent to plaintiff's application for exemption Kurtz had "other sources of income," not otherwise explained in the record, in addition to that received from plaintiff and Friends.[8]

Plaintiff has engaged in financial transactions with all of the entities listed above. For the period ending December 31, 1982 plaintiff held a note from Friends in the amount of $7,500. It also held Tzyril's note for $86,681.20.[9] Finally, Suko was indebted to plaintiff for a $6,250.00 loan. In plaintiff's 1983 financial statement it lists the note due from Tzyril. It also lists a note due from Friends, but this one is for $75,000. Apparently the Suko loan was repaid because it is not on plaintiff's 1983 financial statement. The record contains no terms or payment schedule relative to the Tzyril loan. The Friends loan was explicitly made without any terms of repayment schedule.

While plaintiff was applying to the IRS for tax exempt status, a hearing officer of the Illinois Department of Children and Family Services recommended that plaintiff's license to operate as an adoption agency not be renewed because of non-compliance with the state child welfare agency requirements. On May 17, 1985 a state court ordered a Stay of Enforcement of this state administrative decision. The record contains nothing further relative to the status of the state court proceedings.[10]

7. The record shows that Seymour Kurtz (Kurtz) was an "officer" of two entities other than plaintiff, but the record does not indicate what specific office he held with them.

8. On December 3, 1984, plaintiff's attorneys informed the Internal Revenue Service (IRS) that Kurtz worked "full time" for plaintiff and had no "outside" source of income. By letter dated November 11, 1985 the attorneys reported that Kurtz was compensated by Friends of Children, Inc. (Friends) and other sources in addition to plaintiff. The record contains no information relative to what services Kurtz provided for Friends or what his other sources of income were.

9. At the time this debt was listed Tzyril Foundation was inactive, possessed no assets, and was most probably unlikely to repay the note. Plaintiff claims that Tzyril had been "intended" as an organization which would qualify for tax exemption. Plaintiff planned to write off the Tzyril note as a bad debt according to its 1983 financial statement.

10. Under present circumstances it is not deemed material for this opinion to engage in any extended discussion of the state court proceedings. It is enough to note that plaintiff was a licensed agency when it applied for exempt status from the IRS.

As stated previously, by letter dated February 5, 1986, the IRS issued its adverse ruling on plaintiff's application for tax exempt status under section 501(c)(3). The IRS found that plaintiff was not operated exclusively for tax exempt purposes within the meaning of section 501(c)(3). It stated that plaintiff operated in a manner not "distinguishable from a commercial adoption agency." Therefore, said the IRS, a substantial purpose of the adoption activity was a nonexempt commercial purpose. Furthermore, the IRS found plaintiff failed to prove that none of its net earnings inured to the benefit of a private individual and that it did not serve private individuals.

On April 25, 1986 plaintiff filed its complaint in this court seeking a declaratory judgment under section 7428 with respect to its section 501(c)(3) status. Plaintiff alleged two grounds for relief. First, plaintiff alleged that the IRS Commissioner (Commissioner) had erroneously determined that it did not qualify as a charitable and educational organization under section 501(c)(3). Second, plaintiff alleged that the Commissioner abused his discretion in denying plaintiff tax exempt status because many similar organizations have been granted exemptions.

## Discussion

Section 7428 permits this court, along with the Tax Court and the United States District Court for the District of Columbia to issue a declaratory judgment relative, *inter alia*, to an organization's initial qualification as an organization described in section 501(c)(3). An organization described in section 501(c)(3) is exempt from taxation pursuant to section 501(a). In order to invoke section 7428 plaintiff must first exhaust its administrative remedies and bring suit within 90 days after the IRS has made its final adverse determination. In the case at bar, plaintiff has satisfied these jurisdictional prerequisites.

■ The scope of review in this type of case is usually limited to the administrative record. This is particularly true in initial determination cases such as the case at bar. *The Church of the Visible Intelli-*

*gence that Governs the Universe v. United States,* 4 Cl.Ct. 55, 60 (1983); *Dumaine Farms v. Commissioner,* 73 T.C. 650, 663 (1980); *Houston Lawyer Referral Service v. Commissioner,* 69 T.C. 570, 574 (1978). Only upon a showing of good cause will a court allow a party to introduce additional evidence that was not part of the administrative record. *Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 60; *First Libertarian Church v. Commissioner,* 74 T.C. 396, 398 (1980); *see also Unitary Mission Church v. Commissioner,* 74 T.C. 507, 515 (1980), *aff'd,* 647 F.2d 163 (2d Cir.1981). Thus, judicial review in this case is confined to the materials that are contained in the administrative record filed with the court. *See Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 60; *Church In Boston v. Commissioner,* 71 T.C. 102, 105 (1978). This is not to say, however, that matters outside the administrative record may not be taken into account by a court in special situations. No such special circumstances exist in this case.

■ The legislative history of section 7428 makes it clear that Congress intended that this court follow the practices of the Tax Court in Section 7428 declaratory judgment actions. *See Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 60. The Tax Court rules governing this type of case provide that facts in the administrative record are deemed true and that the plaintiff/taxpayer has the burden of proving that the IRS determination was wrong. Tax Court Rule of Practice and Procedure 217. Thus, the court will assume that the facts in the administrative record before it are true. *See Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 60. It is plaintiff's burden to prove that the determination by the IRS, based on those facts, was incorrect. *See id.; Incorporated Trustees of Gospel Worker Society v. United States,* 510 F.Supp. 374, 377 n. 6 (D.D.C.1981), *aff'd,* 672 F.2d 894 (D.C.Cir.1981), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1982). Finally, the fact that an entity is organized under a "not-for-profit" state

statute, as is the situation in this case, carries little or no weight in consideration of the issues at hand. The focus of the court's inquiry must be on the manner of the operation of plaintiff's business. *See Senior Citizens Stores, Inc. v. United States,* 602 F.2d 711, 713 (5th Cir.1979).

■ The IRS determination that plaintiff challenges through this action is one in which the IRS found that plaintiff did not qualify as an organization described in section 501(c)(3). An organization that does qualify as an organization described in section 501(c)(3) is exempt from taxation pursuant to section 501(a). To qualify under section 501(c)(3) an organization must, *inter alia:* (1) be organized and operated exclusively for a tax-exempt purpose; and (2) not have any of its net earnings inure to the benefit of any private shareholder or individual. Because the requirements are stated in the conjunctive they *all* must be met. *Lowry Hospital Association v. Commissioner,* 66 T.C. 850, 857 (1976). Failure to satisfy one requirement means there is no exemption, i.e., the organization does not qualify under section 501(c)(3). *Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 61.

It is also important to note that the first requirement set forth above is really "two requirements in one." In order to qualify under section 501(c)(3) an organization must show that it is organized *and* operated exclusively for tax exempt purposes. *Id.;* Treas.Reg. § 1.501(c)(3)–1(a)(1); *see also* Treas.Reg. §§ 1.501(c)(3)–1(b) and 1.501(c)(3)–1(c); *Church of the Visible Intelligence v. United States, supra,* 4 Cl.Ct. at 61; *General Conference of the Free Church v. Commissioner,* 71 T.C. 920, 926 (1979). In the case at bar the IRS determined, *inter alia,* that plaintiff was not operated exclusively for tax exempt purposes. The final adverse ruling of February 6, 1986 makes no reference to plaintiff's organizational status. The parties' briefs address the correctness of the IRS determination concerning the operation of plaintiff but are also silent relative to plaintiff's organizational status. Because fail-

ure to satisfy any one of the section 501(c)(3) requirements is fatal to an organization attempting to qualify under that section, and the court finds that the IRS correctly determined that plaintiff failed to satisfy two requirements other than the organizational requirements, the court need not address the issue of whether or not plaintiff was organized for tax exempt purposes and expresses no opinion relative thereto.

■ As mentioned above, the IRS did determine that plaintiff was not operated exclusively for tax exempt purposes. The "operational test", used to determine if an organization is operated exclusively for tax exempt purposes, is set forth in Treas.Reg. § 1.501(c)(3)–1(c)(1). It is the organization's burden to show that the IRS erred in determining that the organization does not satisfy the operational test. *Dumaine Farms v. Commissioner, supra,* 73 T.C. at 663; *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356 (1978); *Hancock Academy of Savannah, Inc. v. Commissioner,* 69 T.C. 488, 492 (1977). An organization will pass the operational test, i.e., be viewed as operating exclusively for one or more exempt purpose, only if it engages primarily in activities which accomplish one or more such exempt purpose specified in section 501(c)(3). Treas.Reg. § 1.501(c)(3)–1(c)(1); *Dumaine Farms v. Commissioner, supra,* 73 T.C. at 663. In the context of the operational test, the word "exclusively" is a term of art. "Exclusively" does not mean "solely". *See Church in Boston v. Commissioner, supra,* 71 T.C. at 106. The term "exclusively" means that not more than an insubstantial part of an organization's activities are in furtherance of a non-exempt purpose. Treas.Reg. § 1.501(c)(3)–1(c)(1). A single substantial activity in furtherance of a non-exempt purpose disqualifies an organization from exemption, despite the presence of any other exempt purposes. *Fraternal Medical Specialist Services, Inc. v. Commissioner,* 49 T.C.M. 289, 292 (1984); *see also Better Business Bureau v.*

*United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945).[11]

■ In addition to the requirements contained in the operational test set forth in Treas.Reg. § 1.501(c)(3)–1(c)(1), it is important to note that an organization may qualify under section 501(c)(3) if it operates a trade or business as a substantial part of its activities, provided that the operation of the trade or business is in furtherance of the organization's tax exempt purpose and the organization is not organized and operated for the primary purpose of carrying on an unrelated (taxable) trade or business, as described in section 513. Treas.Reg. § 1.501(c)(3)–1(e); *see B.S.W. Group Inc. v. Commissioner, supra,* 70 T.C. at 357.

■ Although decided prior to the promulgation of the pertinent regulations, there is Court of Claims precedent which addresses the qualification for exemption in a manner consistent with the current regulations and related case law. The Court of Claims has held that the key to determining whether an organization, which at first blush might appear to be engaged in commercial activities that would disqualify it from exemption under section 501(c)(3), is qualified for exemption is whether the business purpose of the activities is incidental to the charitable purpose or vice versa. *American Institute for Economic Research v. United States,* 157 Ct.Cl. 548, 555, 302 F.2d 934, 937–38 (1962), *cert. denied,* 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1963); *Scripture Press Foundation v. United States,* 152 Ct.Cl. 463, 471, 285 F.2d 800, 805 (1961), *cert. denied,* 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962). *See also B.S.W. Group, Inc. v. Commissioner, supra,* 70 T.C. at 357. This analysis is consistent with current law that: (1) a qualifying organization's activities must be primarily

(not less than substantiately) in furtherance of an exempt purpose [12], Treas.Reg. § 1.501(c)(3)–1(c)(1); *Fraternal Medical Specialist Services, Inc. v. Commissioner, supra,* 49 T.C.M. at 291, and (2) any trade or business operated by the organization in furtherance of an exempt purpose is acceptable, so long as that trade or business, *qua* trade or business, does not become primary to the organization's exempt purposes, Treas.Reg. § 1.501(c)(3)–1(e). It is this two-pronged analysis that the court will use in reviewing the IRS determination relative to plaintiff's operational status.

In the instant case, plaintiff provides services for unwed mothers and children incident to its operation of an adoption service. Plaintiff claims that the services provided for the mothers and children qualify as exempt purposes recognized under section 501(c)(3). There was never an IRS determination on this specific point. Rather it focused on the nature of the adoption service offered by plaintiff.

For purposes of the present discussion the court can assume that the services provided to the mothers and children qualified as exempt purposes under section 501(c)(3). However, *see* note 14, *infra.* The key inquiry would then become whether or not plaintiff's adoption service prevents it from qualifying under the operational test as a tax exempt organization.

Under the first guideline set out above, if plaintiff's adoption service itself constituted an exempt purpose under section 501(c)(3), or if the adoption service was not more than an insubstantial part of plaintiff's activities, the existence of the adoption service would not prevent qualification. It is obvious, and deserves little comment, that the adoption service is by no means an insubstantial portion of plain-

---

11. Although *Better Business Bureau v. United States,* 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945) was concerned with section 811(b)(8) of the Social Security Act, that section's terms were substantially similar to those of section 501(c)(3) and citation to *Better Business Bureau v. United States, supra,* is appropriate in section 501(c)(3) cases. *American Institute for Economic Research v. United States,* 157 Ct.Cl. 548, 554 n. 1, 302 F.2d 934, 937 n. 1 (1962).

12. The key factor is the *purpose* of the activity and not the *nature* of the activity. *Fraternal Medical Specialist Services, Inc. v. Commissioner,* 49 T.C.M. 289, 291 (1984); *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356–57 (1978). This is further supported by the fact that a qualifying organization can engage in a trade of business so long as the trade or business furthers an exempt *purpose.* Treas.Reg. § 1.501(e)(3)–1(e).

tiff's activities. The adoption service provided all of plaintiff's revenues. Placing a child for adoption is also the ultimate goal of plaintiff.

■ Section 501(c)(3) does not contain "adoption service" as one of its exemptions.[13] Plaintiff claims that its adoption service is at the end of a "continuum" which begins with educational and charitable services for unwed mothers and their babies. The adoption service, plaintiff argues, is not severable from the educational and charitable services it provides. Because adoption services do not in and of themselves constitute an exempt purpose, plaintiff must really argue that its adoption service is primarily in furtherance of other exempt purposes, i.e., the adoption service's place on the "continuum" is such that this activity furthers the exempt purposes of providing educational and charitable services to the unwed mothers and children. The court finds it does not.

■ All of the services provided by plaintiff to the unwed mothers and children could ostensibly be provided without the adoption service. Plaintiff argues that the adoption service is integral to the unwed mothers' prenatal care because it provides them with "peace of mind" that their babies will have a good home after delivery. Yet this hardly seems to support a contention that the adoption service is operated *primarily* for accomplishing educational and charitable purposes.

■ Of course plaintiff contends that the adoption service is operated in further-ance of providing educational and charitable services to the unwed mothers and children because the adoption service provides the funding for the exempt purposes. Funding an exempt activity can in and of itself constitute an exempt activity. *See World Family Corp. v. Commissioner*, 81 T.C. 958, 963 (1983). This contention calls into question whether providing funding for the educational and charitable services is the *primary* purpose for which plaintiff operates the adoption agency or whether there is some other purpose(s) served by the adoption agency which removes the "primary" from the purpose of providing funds.

This consideration dovetails into the second of the guidelines set forth above. The adoption service provided by plaintiff is in the nature of a trade or business. Operation of a trade or business does not automatically negate an organization qualifying for an exemption. *See* Treas.Reg. § 1.501(c)(3)–1(e). However, the organization must be operated primarily to carry on an exempt purpose. Thus the relevant inquiry again is: does plaintiff's adoption service primarily further exempt purposes or other purposes. Put another way, is the promotion of exempt purposes primary to business purposes or vice versa? This is a question of fact to be decided on the evidence in the record. *B.S.W. Group, Inc. v. Commissioner, supra*, 70 T.C. at 357 (citations omitted).

■ The court finds that the business purpose, and not the advancement of educational and charitable activities purpose,

---

**13.** Despite some attempted inferences in that direction, plaintiff offers no authority that an adoption service (such as the one plaintiff runs) is a charitable purpose *per se*, under section 501(c)(3). Plaintiff argues most vigorously that an adoption agency is "inherently charitable." As "proof" of this contention, plaintiff states that there are many adoption agencies which qualify for "not-for-profit" status and those adoption agencies which are operated for profit provide only a very small portion of the overall adoptions. Of course the fact, which plaintiff admits, that there are for-profit adoption agencies must call into question the supposed "inherently charitable" nature of adoption agencies. Plaintiff's position is premised on its argument that for-profit adoption agencies are the excep-tion to the inherently charitable rule. It states that the IRS has done nothing to show that plaintiff is within this exception. Such a claim by plaintiff appears to be an attempt on its part to shift its burden of proof to entitlement to an exemption. *See* discussion, *supra*, p. 10 relative to "not-for-profit" organizations.

The Revenue Ruling plaintiff cites, Rev.Rul. 80–200, 1980–2 C.B. 173 is distinguishable from the case at bar. That ruling stated that the care of *orphans* and the placement and adoption of *orphans* constituted charitable activities. Plaintiff does not care for or place orphans. Additionally, in Rev.Rul. 80–200 the agency relied on contributions as well as fees for its support. Plaintiff receives no contributions, nor does it solicit or seek contributions.

of plaintiff's adoption service is its primary goal. Plaintiff is in competition with other adoption services. Thus it is competing with other commercial organizations providing similar services. This is far different than an organization which solicits charitable contributions. Plaintiff's competition provides its activities with a commercial hue. *See American Institute for Economic Research v. United States, supra,* 157 Ct.Cl. at 555, 302 F.2d at 938. "Competition with commercial firms is strong evidence of the predominance of non-exempt commercial purposes." *B.S.W. Group, Inc. v. Commissioner, supra,* 70 T.C. at 358.

Plaintiff in past years has accumulated very substantial profits. The court realizes that the presence of profits does not automatically prevent an organization from qualifying under section 501(c)(3). *See Industrial Aid for the Blind v. Commissioner,* 73 T.C. 96, 101 (1979). However, the existence of profits certainly can be indicative of a business purpose. *See Scripture Press Foundation v. United States, supra,* 152 Ct.Cl. at 468, 285 F.2d at 803; *B.S.W. Group, Inc. v. Commissioner, supra,* 70 T.C. at 357. The substantial fees plaintiff charged were not incidental to plaintiff's exempt purposes but rather admittedly were designed to make a profit. *See Scripture Press Foundation v. United States, supra,* 152 Ct.Cl. at 472, 285 F.2d at 804. The profit-making fee structure of the adoption service looms so large as to overshadow any of its other purposes. *See id.* at 475, 225 F.2d at 807. It is also noted that plaintiff's only source of income was the fees charged adoptive parents. This is a factor indicating the commercial character of the operation. *See B.S.W. Group, Inc. v. Commissioner, supra,* 70 T.C. at 359–60. The fact that plaintiff never solicited, nor does it plan to solicit charitable contributions to further its operation is another factor indicating a commercial opera-

tion. *Id.* at 359. · *See also Federation Pharmacy Services, Inc. v. Commissioner,* 625 F.2d 804, 808 (8th Cir.1980).

In its moving brief, plaintiff offers three reasons why it must accumulate profits. In its reply brief plaintiff offers a fourth reason. None are persuasive. First, it cites to a state law requiring that an adoption agency maintain financial stability. Yet this law indicates only that an agency must maintain "financial solvency". It says nothing about accumulating profits. Next, it says that the profits are needed as a sort of self insurance for certain contingencies. There is nothing in the record to suggest that insurance for these contingencies is not available through conventional insurers. Additionally, it says that it needs the profits to provide for various services to the unwed mothers and children. However, plaintiff also claims that the fees paid by the adoptive parents cover these services.[14] Finally, plaintiff states it is planning to purchase a residential facility because the cost of rent is so high. The record is devoid of any evidence of this. The pages plaintiff cites merely says that plaintiff had to expend high sums of rental property it would not have had to spend if it owned its own facility.

Plaintiff's response to the deficiencies in the record relative to the above discussion on the reasons for accumulation is as follows. In various submissions to the IRS during the application process plaintiff made some of the same arguments it makes here concerning the reasons for accumulating profits. These arguments were made in memoranda which are now included in the administrative record. Therefore, says plaintiff, these reasons for profit accumulation contained in these memos must be accepted as true. Plaintiff fails to distinguish the difference between its arguments and facts. An argument made by plaintiff during the administrative process is not somehow converted into an

---

**14.** As mentioned above, in order to facilitate discussion and give plaintiff's argument full rein, the court has proceeded under the assumption that plaintiff provides exempt educational and charitable services to unwed mothers and children. Yet in examining the business versus exempt purposes of the adoption service the court notes that these services are also designed to produce healthy babies. This is important to plaintiff because it can charge full fees for healthy babies and healthy babies allow it to minimize its health care costs.

unreviewable fact by having been included in the administrative record. The court is not precluded from examining the merits of plaintiff's argument which is presented to it.

The IRS also found that plaintiff failed to qualify as an organization described in section 501(c)(3) because plaintiff failed to establish that no part of its net earnings inured to private individuals or that plaintiff served private individuals. Pursuant to section 501(c)(3) an organization does not qualify for tax exempt status if any of its net earnings inures to the benefit of any private shareholder or individual.[15] The phrase "private shareholder or individual" refers to persons having a personal and private interest in the activities of the organization. Treas.Reg. §§ 1.501(c)(3)–1(c)(2); 1.501(a)–1(c). Furthermore, an organization is not organized and operated exclusively for section 501(c)(3) purposes if it serves a public rather than private interest. Treas.Reg. 1.501(c)(3)–1(d)(1)(ii).

■ Plaintiff argues that the IRS never named the individuals to whom its net earnings inured nor named the private individuals plaintiff served. Therefore, plaintiff contends, the IRS determination was wrong. This argument appears to be an attempt on the part of plaintiff to shift the burden of proof it must satisfy in order to establish its exemption. It is the taxpayer who must prove its entitlement to an exemption. *The Founding Church of Scientology v. United States*, 188 Ct.Cl. 490, 496, 412 F.2d 1197, 1200 (1969). It is the taxpayer who must demonstrate that no part of its earnings inured to the benefit of any private individual. *The Basic Unit Ministry of Karl Schurig v. Commissioner*, 670 F.2d 1210, 1211, 1213 (D.C.Cir. 1982). Likewise, it is the responsibility of an organization to establish that it serves a

public rather than private interest. Treas. Reg. § 1.501(c)(3)–1(d)(1)(ii). Plaintiff cannot make up for the lack of an affirmative showing on its part that there is not any inurement or service to private interests by claiming that the IRS has not proven that there is. The IRS does not have to "prove" anything. It is plaintiff's burden to prove its net earnings do not inure to the benefit of a private shareholder or individual or that it does not serve a private interest.

■ The term "net earnings" in section 501(c)(3) allows an organization to incur ordinary and necessary expenditures in its operations without losing its tax exempt status. *The Founding Church of Scientology v. United States, supra*, 188 Ct.Cl. at 496, 412 F.2d at 1200. One of those ordinary and necessary expenditures is the payment of reasonable salaries. Thus payment of a reasonable salary to an employee of the organization does not automatically result in inurement. *Id.; Fraternal Medical Specialist Services, Inc. v. Commissioner, supra*, 49 T.C.M. at 292. However, payment of an excessive salary will result in inurement. *The Founding Church of Scientology v. United States, supra*, 188 Ct.Cl. at 496, 412 F.2d at 1200; *Unitary Mission Church v. Commissioner, supra*, 74 T.C. at 514. Whether a salary is reasonable or excessive is a question of fact. *Unitary Mission Church v. Commissioner, supra*, 74 T.C. at 514. One of the factors used in determining the reasonableness of a salary is whether or not an individual works for an organization full time. Income received from other sources is an indication that the recipient is not employed on a full time basis by the organization. *The Founding Church of Scientology v. United States, supra*, 188 Ct.Cl. at 498, 412 F.2d at 1201:

---

**15.** The Tax Court has held on more than one occasion that the requirement prohibiting inurement to private shareholders and individuals is redundant to the operational test since in order to qualify as operating for an exempt purpose an organization must provide a public not a private benefit. *Unitary Mission Church v. Commissioner*, 74 T.C. 507, 512 n. 7 (1980), *aff'd*, 647 F.2d 163 (2d Cir.1981); *Western Catholic Church, v. Commissioner*, 73 T.C. 196, 209 n. 27,

213 (1979), *aff'd*, 631 F.2d 736 (7th Cir.1980). Nevertheless, in the case at hand, the IRS separately stated that plaintiff was not operated for an exempt purpose and had not proven its net earnings did not inure to the benefit of a private shareholder or individual. As a result, the court will undertake a separate analysis of the inurement issue in the interest of sequential completeness.

■ Net earnings may inure to an individual in ways other than the payment of excessive salaries. For example, the existence of a private source of loan credit from an organization's earnings may amount to inurement. *The Founding Church of Scientology v. United States, supra,* 188 Ct.Cl. at 499, 412 F.2d at 1201; *Unitary Mission Church v. Commissioner, supra,* 74 T.C. at 515.

■ It is also important to note that section 501(c)(3) specifically provides that "no part" of the organization's net earnings may inure to a private shareholder or individual. This means that any inurement, regardless of amount, will prevent an organization from qualifying under section 501(c)(3). *The Founding Church of Scientology v. United States, supra,* 188 Ct.Cl. at 497, 412 F.2d at 1200; *Unitary Mission Church v. Commissioner, supra,* 74 T.C. at 513.

As mentioned above, the IRS determined that plaintiff failed to prove that none of its net earnings inured to the benefit of a private individual. Defendant argues that inurement is supported by two factors: (1) the size of Kurtz's salary and the amount of any other income from other sources and (2) loan transactions made by plaintiff. Plaintiff asserts these issues were never raised until the present litigation. However, the record shows that the IRS was concerned about, and placed plaintiff on notice relative to these two issues during the administrative process.

■ The court finds the IRS conclusion supportable on the record before it. It is well settled that plaintiff must satisfy all the requirements for a tax exempt organization. *See Western Catholic Church v. Commissioner,* 73 T.C. 196, 207, *aff'd,* 631 F.2d 736 (7th Cir.1980). Indeed, on this record, the court is persuaded that plaintiff could not make such a showing because part of its net earnings clearly inured to the benefit of Kurtz, plaintiff's president and sole life member. As president and sole life member, Kurtz qualifies as a private shareholder or individual as defined by the pertinent regulations. Treas.Reg. §§ 1.501(c)(3)–1(c)(2) and 1.501(a)–1(c).

Kurtz was paid a salary of in excess of $45,000 for his work for plaintiff in the year 1983. That same year, he was also compensated by another adoption agency, Friends, and also received income from "other sources." The record does not disclose how many hours per week Kurtz worked for plaintiff. As pointed out above, the presence of at least two other sources of income would indicate Kurtz's salary of over $45,000 was for part time employment with plaintiff. *See The Founding Church of Scientology v. United States, supra,* 188 Ct.Cl. at 498, 412 F.2d at 1201.

Additionally, plaintiff has provided loans to three organizations which Kurtz was either employed by or owned. Coupled with his status as a "life member" of plaintiff, this factor takes on added significance. A loan in excess of $86,000 was made by plaintiff to the Tzyril Foundation. The record contains nothing concerning any terms or repayment schedule relative to this loan. However, plaintiff's 1983 financial statement does indicate that plaintiff planned to write off the Tzyril loan as a bad debt. The 1983 financial statement also showed a loan outstanding to Friends in the amount of $75,000. The record shows that this loan to Friends was expressly made without any terms or repayment schedule. Finally a smaller loan for over $6,000 was made by plaintiff to the Suko Corporation. From all indications in the record, this loan was repaid.

Plaintiff claims that the Friends and Tzyril loans should not disqualify it from exempt status because they were made to organizations similar to itself for charitable purposes. There is absolutely no evidence in the record relative to the purposes of these loans. The loan to Suko was made to a for-profit corporation. Apparently the loan was not outstanding at the time of plaintiff's application. Nevertheless the fact that it was made shows that companies controlled by Kurtz had a *source* of loan credit in plaintiff. The existence of a source of credit is what it important. *The Founding Church of Scientology v. United States, supra,* 188 Ct.Cl. at 499, 412

F.2d at 1201; *Unitary Mission Church v. Commissioner, supra,* 74 T.C. at 515.

The totality of facts contained in the record certainly shows that a portion of plaintiff's net earnings inured to the benefit of Kurtz. His $45,000 salary for part time employment and utilization of plaintiff as a source of credit for other corporations add up to inurement as defined by the pertinent regulations and case law.[16]

As a final issue, plaintiff attacks the IRS determination by dressing its argument in the traditional garb of an administrative review claim. Plaintiff contends that the IRS abused its discretion by determining that plaintiff did not qualify as a section 501(c)(3) organization because it has made favorable determinations for adoption agencies similar to plaintiff.

Of course plaintiff's argument flies right in the face of the general rule that it must establish its own exemption qualification. *See The Founding Church of Scientology v. United States, supra,* 188 Ct.Cl. at 496, 412 F.2d at 1200. Yet plaintiff relies on *International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) as carving out an exception to this general rule. It is true that in *International Business Machines Corp. v. United States, supra,* the Court of Claims held that there were certain situ-

ations in which a taxpayer seeking an exemption could successfully point to the treatment another taxpayer was receiving in order to support an exemption claim. *Id.* at 365, 343 F.2d at 919. However, these exceptions to the general rule are specifically provided by Congress. *Id.* Moreover, the *International Business Machine Corp.* holding, as a precedent, has been severely circumscribed. *Knetsch v. United States,* 172 Ct.Cl. 378, 391 n. 14, 348 F.2d 932, 940 n. 14 (1965), *cert. denied,* 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966); *see also Bornstein v. United States,* 170 Ct.Cl. 576, 586 n. 2, 345 F.2d 558, 564 n. 2 (1965); *Carpenter v. United States,* 7 Cl.Ct. 732, 739–40 (1985), *aff'd,* 740 F.2d 91 (Fed.Cir.1986).[17] There is nothing in the record before the court which would support its application to the facts at hand.

In the matter of qualifying for a charitable exemption under section 501(c)(3), the court finds no Congressional mandate that the general rule that a taxpayer must establish its own exemption should not be followed. Additionally, applicable Treasury Regulations suggest the contrary. First, the regulations speak in terms of tests that an organization must satisfy in order to establish its exemption. Treas. Reg. §§ 1.501(c)(3)–1(a), 1(b)(1) and 1(c)(1). Second, Treas.Regs. § 1.501(c)(3)–1(d)(1)(ii)

---

**16.** In its adverse determination of February 6, 1986, the IRS also referred to plaintiff's failure to prove that it did not serve a private interest. An organization will not qualify as being operated exclusively for exempt purposes if it serves a private rather than a public interest. Treas.Reg. § 1.501(c)(3)–1(d)(1)(ii); *Goldsboro Art League, Inc. v. Commissioner,* 75 T.C. 337, 343 (1980); *Callaway Family Association v. Commissioner,* 71 T.C. 340, 344 (1978); *Baltimore Health and Welfare Fund v. Commissioner,* 69 T.C. 554, 557 (1978). Apparently picking up on a point raised in the IRS proposed ruling of June 7, 1985, plaintiff argues that providing services to a limited class, i.e., adoptive parents, does not mean that it serves a private interest. This contention may be correct as a generality. The concept of providing a private benefit is usually limited to the organization's insiders. *Sound Health Association v. Commissioner,* 71 T.C. 158, 185–86 (1978). In both *Baltimore Health and Welfare Fund v. Commissioner, supra,* and *Callaway Family Association v. Commissioner, supra,* exemptions were denied because the organizations

served purposes which benefited the private interests of their members. However, such an argument does nothing to take away from the fact that a portion of plaintiff's earnings inured to the benefit of Kurtz. The circumstances of this case show plaintiff's close ties to outside organizations, for example, plaintiff and Friends share a common principal director and two members of plaintiff's Board of Directors also sit on the Board of Directors of Friends. Too, Kurtz was a prominent figure in both organizations and functioned as an important official in these organizations.

**17.** It is interesting to note that Judge Davis, the author of the opinion in *International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966), sought to limit the "equality of treatment" principle in his opinion in *Righter v. United States,* 194 Ct.Cl. 400, 431–35, 439 F.2d 1204, 1221–24 (1971) (dissenting opinion).

provides that in order to show that an organization is organized and operated exclusively for tax exempt purposes, "it is necessary for [*the*] *organization to establish*" it is not organized and operated to benefit private individuals. *Id.* (emphasis added).

More importantly, the case at bar and *International Business Machines Corp. v. United States, supra,* simply present two extremely different situations, both factually and legally. In the latter case the Court of Claims had before it enough evidence to show that the taxpayer's exemption claim concerned machines that were virtually identical to the machines produced by Remington Rand, its competitor, who was receiving an exemption. In the present case the court is confined to the information contained in the administrative record. This record contains information on only one of the organizations plaintiff claims is exempt, i.e., The Golden Cradle. The information relative to The Golden Cradle simply does not suggest the same degree of identicalness as to circumstances between plaintiff and The Golden Cradle as was contained in *International Business Machines Corp. v. United States, supra,* between IBM and Remington Rand.

■ The court finds that plaintiff's "abuse of discretion" argument is misplaced because it ignores plaintiff's burden to prove its own exemption and tries to introduce an element of reliance upon other taxpayers' exemptions to support its exemption. Generally, a taxpayer cannot premise its right to an exemption by showing that others have been treated more generously, leniently or erroneously by IRS. The fact that there may be some taxpayers who have avoided paying a tax does not relieve other similarly situated taxpayers from paying their taxes. *Wag-*

*ner v. United States,* 181 Ct.Cl. 807, 817–18, 387 F.2d 966, 972 (1967). This general rule was recognized in *International Business Machine Corp. v. United States, supra,* 170 Ct.Cl. at 365, 343 F.2d at 919, relied on by plaintiff, but not applied in that case because of circumstances unique to that case. No such unique circumstances are present in the case at bar. Accordingly, the general rule, set out above, is for application relative to plaintiff's argument of abuse of discretion by the IRS.

■ Even addressing the merits of plaintiff's contention, the court finds the adverse determination cannot be viewed as an abuse of IRS discretion. In the case at bar, the IRS made its determination on the basis of plaintiff's application and materials submitted in support thereof. On the basis of those materials before the IRS, which were provided by plaintiff, the IRS determination is supported by substantial evidence and certainly does not manifest an abuse of discretion. Unlike the situation in *International Business Machine Corp. v. United States, supra,* 170 Ct.Cl. at 357, 343 F.2d at 914, where the critical issue was the interest of equality and fairness relative to private revenue rulings dealing with identical machines in the same or comparable situations, the case at bar does not involve private revenue rulings directed at identical or comparable situations, as far as this record is concerned. Instead, this case involves its own particular, and perhaps unique, set of circumstances which generated the IRS determination under attack. The fact that other adoption agencies may have qualified for exemption is immaterial under the facts of this case.[18]

■ In rejecting plaintiff's application for exempt status under section 501(c)(3), the IRS found that plaintiff operated in a

**18.** These other adoption agencies may have made a better showing on the administrative record than plaintiff did in this case. It is plaintiff's burden to present all facts supportive of its tax exemption claim at the administrative level. *See American Science Foundation v. Commissioner,* T.C.M. (P–H) ¶ 86,556 (Nov. 20, 1986). There is no hint that plaintiff was inhibited in any way by the IRS in its presentation of material supportive of its position. *Id.* Plain-

tiff similarly was aware at that time that other adoption agencies had received an exemption. Its reference to The Golden Cradle organization, discussed *supra,* establishes this fact. The facts may have been different in other adoption exemption cases and most probably were. For example, plaintiff relies on Revenue Ruling 80–200, *supra.* Yet as discussed in note 13, *supra,* the case at bar is distinguishable from that ruling.

manner not "distinguishable from a commercial adoption agency."[19] The record supports the view that operation of an adoption agency is not an inherently charitable operation. For profit adoption agencies do exist. The record establishes a number of factors which characterize a "commercial adoption agency" and which are applicable to plaintiff's operation. Plaintiff's operation made substantial profits; there was a substantial accumulation of capital surplus in comparison to direct expenditures by plaintiff for charitable and educational purposes (i.e., the care and counseling provided destitute unwed mothers-to-be). *See Scripture Press Foundation v. United States, supra; American Institute for Economic Research v. United States, supra.* Plaintiff's operation was funded completely by substantial fixed fees charged adoptive parents; it relied entirely on those fees and sought no funds from federal, state or local sources, nor engaged in fund raising programs, nor did it solicit contributions. *B.S.W. Group, Inc. v. Commissioner, supra. Federation Pharmacy Services, Inc. v. Commissioner, supra.* Indeed, plaintiff had no plans nor intention to seek contributions, government grants or engage in fund raising relative to its operations. Too, plaintiff does not coordinate its adoption activities with any governmental adoption agencies. Further, the fixed fees plaintiff charged adoptive parents were not subject to downward adjustment to meet potential adoptive parents' income or ability to pay. *See Murphy v. Commissioner,* 54 T.C. 249, 250–51 (1970) (adoption agency qualified as charitable organization under section 170(c)). Finally, plaintiff's organization was structured and operated more like a commercial organization. Its membership was organized into classes of memberships, single life member and ordinary members. Like a sole stockholder in a commercial corporation, the life member has inherent power and control and, like stock, such life membership is transferable. Like a commercial corporation, plaintiff functions by means of a paid staff of 15 to 20 persons, with no volunteer help.

While these factors standing alone may or may not reflect the dominant commercial character of an organization, the totality of these factors, present in this record, clearly support the IRS determination that plaintiff's operation is not "distinguishable from a commercial adoption agency."

### Conclusion

For the reasons set forth above, the court finds that the IRS determination of February 6, 1986 was correct. Therefore plaintiff is not entitled to the relief it requests.[20] The complaint is to be dismissed. No costs.

---

**19.** Plaintiff argues that the IRS determination fails to define in terms how a "commercial adoption agency" operates or to identify any such commercial adoption agencies by name. However, such specificity is not required. What is required is the presence in the record before the IRS of those factors which are "commonly associated with a commercial enterprise." *See American Institute for Economic Research v. United States, supra,* 157 Ct.Cl. at 556, 302 F.2d at 938. The language used by the IRS to which plaintiff directs criticism, is similar to language utilized by courts to capsule their conclusion, drawn from the record, that plaintiff's business operated in the manner of other similar businesses. *See, e.g., Senior Citizens Stores, Inc. v. United States,* 602 F.2d 711, 714 (5th Cir.1979)

("plaintiff's business is not distinguishable from that of many, typical family operated businesses * * *.").

**20.** Plaintiff is certainly entitled to make another application for qualification under section 501(c)(3). If it presents additional information to the IRS and its application is again rejected, plaintiff could file another declaratory judgment action. The new information plaintiff relied on would then be part of a new administrative record and available for the court to review. *American Science Foundation v. Commissioner, supra,* T.C.M. (P–H) ¶ 86,556; *Houston Lawyers Referral Service v. Commissioner,* 69 T.C. 570, 577–78 (1978).