**AIRLIE FOUNDATION, INC. Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 89–0258 (TAF).**

United States District Court,
District of Columbia.

May 19, 1993.

538

Mitchell Rogovin, John D. Worland, Jr., Lynnette N.M. Platt, Donovan Leisure, Rogovin & Schiller, Washington, DC, for plaintiff.

Gerard J. Mene, Gregory D. Stefan, Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the Court on the United States' motion for summary judgment. This suit was filed following a decision of the Internal Revenue Service ("IRS") to revoke the tax-exempt status of Airlie Foundation, Inc. ("AFI"). AFI seeks a declaratory judgment under 26 U.S.C. § 7428 that it is still entitled to its tax-exempt status.

### I.

AFI has been classified as a tax exempt organization since 1963. In 1979, Dr. Murdock Head, the founder and executive director of AFI, was convicted in the Eastern District of Virginia of conspiracy to commit tax fraud and to bribe public officials. The Fourth Circuit reversed the conviction based on an improper jury instruction. *United States v. Head,* 641 F.2d 174 (4th Cir.1981). Dr. Head was retried and again convicted in 1981. The conviction was affirmed in *United States v. Head,* 697 F.2d 1200 (4th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77

L.Ed.2d 1367 (1983). AFI and Raven's Hollow, Ltd., a related corporation also controlled by Dr. Head, were named as unindicted co-conspirators in the case.[1]

Based on the testimony at the criminal trials, the IRS began to examine AFI's tax-exempt status for the years 1976 through 1980. The IRS notified AFI of its concern by a draft technical advice memorandum ("draft TAM"), dated December 15, 1980. The draft TAM identified eleven issues to be addressed, each constituting a potential ground for revocation. Subsequent to the issuance of the draft TAM, AFI sought and received several extensions of time in which to respond to the draft TAM. AFI filed its response, called a protest, in 1983. AFI challenged the IRS' use of grand jury materials and testimony from Dr. Head's criminal trials in its evaluation of AFI's tax-exempt status. The Fourth Circuit ultimately upheld this practice. *United States v. Under Seal*, 783 F.2d 450 (4th Cir.1986), *cert. denied sub nom, Raven's Hollow, Ltd. v. United States*, 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987).

In 1988, the IRS completed its determination which had been held in abeyance while the IRS' use of the grand jury materials and testimony was being challenged. In November 1988, the IRS issued its final TAM, revoking AFI's exempt status effective January 1, 1976, based on its conclusion that AFI was serving the private interests of Dr. Head. The IRS also based the revocation on its conclusion that AFI was operating as a commercial enterprise.

Following a hearing on the United States' motion for summary judgment, the Court remanded the matter to the IRS. The Court directed the IRS to set forth the facts, with specific citations to the administrative record, on which the IRS had based its revocation decision, in order that the Court could review the IRS' conclusions. *See Memorandum Order*, August 21, 1992, 1992 WL 280796. The IRS filed a compliance document in October 1992.

## II.

### A. *Network of organizations*

The IRS revoked AFI's exempt status based, in part, on the conclusion that AFI was serving the private interests of Dr. Head.[2] This conclusion rests on Dr. Head's control over a network of organizations, including AFI, that were involved in numerous transactions and exchanges of money, marketable assets and land.

At the center of this network was AFI, which was incorporated in 1960 as a Virginia non-stock corporation. Dr. Murdock Head founded AFI. The Foundation applied for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code on August 17, 1962. The Foundation's application was referred to the Internal Revenue Service National Office for consideration and exempt status was granted in 1963. Dr. Head served as the unpaid Executive Director of AFI until October 1979. He admitted at his criminal trial that he controlled AFI. *Head II, vol. XVIII* at 85–86.[3]

---

**1.** The government argues that Dr. Head's conviction for conspiring to defraud the government by shifting expenses to the for-profit company, Raven's Hollow, thereby unlawfully increasing deductions and by shifting income to AFI, thereby unlawfully avoiding taxable income, proves that there was actual abuse of AFI by Dr. Head. A criminal conviction is conclusive proof as to the facts supporting the conviction in a subsequent civil action, the government asserts, citing *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1201 (Fed.Cir.1988), *cert. denied*, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988). Although AFI argues that it was not a party to the criminal trials, it was an unindicted co-conspirator and Dr. Head was its founder and director. *See J.E.T.S.*, 838 F.2d at 1200–1201 (although appellant was not a party in the criminal case, because it had been very much a part of the

activities upon which the criminal convictions were based, even functioning as a wholly owned subsidiary of the corporate parent, as the operating division and alter ego of the parent, the criminal conviction worked against it). The Court need not decide this issue because it finds that the IRS properly revoked AFI's exempt status based on the evidence discussed *infra*.

**2.** For the reasons discussed *infra*, the Court finds that it is not necessary to address the IRS' determination that AFI was operating its conference center as a commercial enterprise.

**3.** Unfortunately, AFI and the government do not rely on the same system for cataloging the exhibits. Consequently, "Gov't.A.R." cites to exhibits using the government's system and "AFI's A.R."

Airlie Farm was another part of the network. It was acquired by Dr. Head and his then wife Mrs. Head in a series of purchases during the 1950s and 1960s. The Heads operated the partnership known as Airlie Farm until 1976. The Heads acquired as partners nearly 1,200 acres of land located near Warrenton, Virginia, between June 1956 and May 1967. On November 1, 1960, AFI leased approximately 388 acres and buildings thereon from the Airlie Farm partnership for five years at $68,900 per year, with three five-year options to renew through 1980. AFI exercised options, including a changed option from five years to 10 years.

AFI, however, did not pay the rent. As of August 21, 1970, AFI owed Airlie Farm $442,740.93 in unpaid rent, represented by an unsecured note to Dr. Head. *AFI's A.R. 22* at 67 (AFI's Protest). Interest due to Airlie Farm was apparently forgiven. In June, 1974, AFI issued a similar note for $132,823 to cover additional rent. *AFI's A.R. 22* at 67. Dr. Head later used the two notes to establish the Airlie Trust, another non-exempt organization which he controlled.

Kimmaren Corporation, another part of the network, was formed as a stock corporation in the Commonwealth of Virginia on December 23, 1975. On December 22, 1976, Dr. and Mrs. Head transferred the Airlie Farm property to their three children. Five days later, on December 27, 1976, Airlie Farm was transferred to Kimmaren Corporation in exchange for stock. The transfer included the realty leased to AFI; Kimmaren then, operated Airlie Farm and became AFI's landlord. *AFI's A.R. 22* at 61. Kimmaren traded under the name Airlie Farm.

Dr. Head controlled Kimmaren and his three children served as directors of the company. Dr. Head served as president and managing executive of Kimmaren Corporation. In 1977, Dr. Head received $12,000 compensation from Kimmaren. His daughter Kimberly Head replaced him as president in 1978. Viola Westlake was an officer for both AFI and Kimmaren Corporation.

Yet another part of the network was Raven's Hollow, Ltd. This company was first incorporated on July 25, 1963. Dr. Head testified that he and Mr. Henry Bernie created Raven's Hollow. *Head II, vol. XVIII* at 79. Dr. Head exerted early control over Raven's Hollow. For example, although Dr. Head's name is not listed as one of the initial board of directors, Mr. Bain, one of the initial board members, testified before the grand jury that the information in the Raven's Hollow Articles of Incorporation came from Dr. Head.

Raven's Hollow was next incorporated as a Virginia non-stock, not-for-profit corporation on December 20, 1965 and was voluntarily dissolved in May of 1977. *AFI's A.R. 22* at 69. A new Virginia for-profit corporation bearing the name Raven's Hollow was formed in May, 1977. *AFI's A.R. 22* at 70 ("New Raven's Hollow"). The new charter authorized the sale of stock so that the new Raven's Hollow entity could raise capital. Amended Complaint at ¶ 46.

Although the day-to-day control over the company may have been handled by paid managers, Dr. Head admitted at his criminal trial that he controlled Raven's Hollow: he was the company's "major-domo." He was a director of Raven's Hollow in 1965. Charles Francis, former president of Raven's Hollow, also confirmed in his trial testimony that Dr. Head controlled the company. *Head I, vol. XVI* at 361.

Dr. Head testified that "Raven's Hollow was created to service the Foundation ... Raven's Hollow, I presume, could exist on its own, but was not created to do that." *Head I, vol. XIX* at 1316. Raven's Hollow performed film work and ground and building maintenance for AFI. Raven's Hollow was located on the grounds of Airlie Foundation and operated from buildings which it leased from Airlie. *AFI's A.R. 22* at 71. John Berne, an official of both AFI and Raven's Hollow, testified before the grand jury that "Raven's Hollow would not have existed if it didn't have a relationship with Airlie Founda-

cites to exhibits using the plaintiff's system. References to "Head I" are to trial transcripts in *United States v. Head,* Crim. No. 79–115–A. References to "Head II" are to trial transcripts in

*United States v. Head,* Crim. No. 81–112–A. References to "Gov't. Trial Ex." are to exhibits used in the trials.

tion ... because there wasn't any other film business at that time." *Gov't.A.R. no. 23(b)* at 45.

In addition to Raven's Hollow's dependence on AFI for business, the two organizations shared several officers and directors. For example, Edwin Bain was the Secretary of AFI and also on the board of Raven's Hollow. John Berne was President of AFI and an official of Raven's Hollow. Most importantly, Dr. Head agreed that it was a fair statement that he, AFI, and Raven's Hollow were synonymous. *Head II, vol. XVIII* at 190.

### B. *Grounds for revocation*

In the final TAM, the IRS set forth various acts involving Dr. Head and this network of organizations that allegedly benefited the private interests of Murdock Head or his family.

#### 1. Airlie III

In August, 1971, Dr. Head and AFI purchased a 42 foot fishing trawler for $62,388. The fishing trawler was modified to include a color television, new wiring to accommodate a refrigerator and other appliances, and chairs for deep-sea fishing. AFI entered into a lease agreement with Raven's Hollow, Ltd. for the trawler, Airlie III, for $28,800 per annum, from 1973 until 1976. Raven's Hollow had difficulty making the rent but AFI did not terminate the lease or reclaim the yacht.

Although the boat was leased to allow Raven's Hollow to perform film work, no log or other record showing use of the trawler was maintained and none was presented to the IRS. *See Head I, vol. XIX* at 1379 (Dr. Head testified that no log was kept for the boat). Dr. Head did use the fishing trawler for personal use, but apparently reimbursed Raven's Hollow for such use. *See AFI's A.R. 29* (letter of May 30, 1985, from AFI's counsel to IRS with attachments of copies of checks used for reimbursement by Dr. Head to Raven's Hollow for use of the Airlie III). Frank Kavanaugh, Executive Director of

AFI, averred that the Airlie III had been used for filming but that its use was terminated due to one of AFI's projects. He also averred that the Airlie III was used as a base of operations for Airlie personnel, to store filming equipment and for fundraising and promotional purposes.

#### 2. Condominium

In 1975, Dr. Head purchased for $29,000 condominium unit Number 101, located at The Old Cove Inn, Naples, Florida. Dr. Head made $5,000 in improvements to the unit. By letter of January 1, 1976, to Mr. Ross, AFI Director, Dr. Head wrote that the condominium was to be "passed free and clear to the Foundation with the retention of right of occupancy for myself in my lifetime based, of course, upon appropriate notice to the Airlie Foundation."[4] On July 30, 1976, Dr. Head donated the condominium to AFI and took a charitable deduction in the amount of $34,000, equal to the unit's appraised fair market value, on his 1976 Federal income tax return. *AFI's A.R. 22* at 86. However, AFI's records do not reflect the alleged transfer nor do AFI's records show the condominium unit as an asset. Additionally, no log or record showing the use of Unit 101 was ever presented to the IRS.

#### 3. AFI buys property from Dr. Head

In June 1979, Dr. Head sold 39.298 acres of real estate to AFI for $300,000. Apparently no appraisal of the property was prepared nor is there any evidence that the sale price was reasonable for the property. Additionally, the transfer is not reflected as an asset on the 1979 return of AFI.

#### 4. Airlie Trust

On July 1, 1974, Murdock Head, as grantor, established an irrevocable trust known as the Airlie Trust. The trust is a separate taxable entity. Dr. Head established the trust with two promissory notes from AFI. The notes represented unpaid rent which AFI owed to Airlie Farm. The first promissory note in the amount of $442,740.93 as well as an additional AFI note in the amount

---

**4.** AFI objects that conveyance by letter is generally ineffective. However, AFI admitted in its

Protest that Dr. Head bought the condominium and transferred it to AFI.

of $132,822.27 payable to Dr. Head was transferred to the Airlie Trust and then paid for by AFI. *AFI's A.R. 22* at 67. AFI is the beneficiary of the trust, but if it ceases to exist, George Washington University will be the beneficiary. AFI did receive some income from the trust.

There are two trust documents and the parties disagree which document controls. The first trust document provided that upon his retirement, Dr. Head was to receive "at least 5%" of the trust *corpus,* on a per annum basis. *Gov't. Trial Ex. A–44a* at ¶ 1(a), (first trust document). The trust agreement was redrafted on the advice of Price, Waterhouse, AFI's certified public accountant, who was concerned that the provision which would have permitted Dr. Head to receive income from the trust would have an effect upon AFI's exempt status. *AFI's A.R. 22* at 88–89 n. 34. This second trust, backdated to July 1, 1974, but recorded in 1977, did not contain the reversionary income interest provision to Dr. Head. However, this document provided for compensation to the Executive Director (Dr. Head) as approved by the Executive Director, as well as the power to replace the trustees if they are unable to act. *Gov't. Trial Ex. A–44* at 1, 4 (second trust document). Under the terms of either trust, as long as AFI exists, the trust corpus is to be used as a fund for the purposes set forth in the document.[5] Additionally,

> Pursuant to the death of the Grantor or following action of the Board of Directors in concert with expressed desire of the Grantor, it may be elected to utilize the corpus of the trust to purchase a portion of the real estate currently leased by Airlie Foundation from Airlie Farm.

*Id.* Under the terms of either trust, then, Dr. Head could benefit, although AFI contends that he has never received any funds or other inurement from the trust.

Although he was not on the board of trustees, Dr. Head exerted control over Airlie Trust. He retained the power under either trust document to replace trustees upon their resignation. Each of the trustees also had some connection to Dr. Head or his three organizations. The trustees of the Airlie Trust were Richard Ross, Edward Bain, and later Jean Head Sisco. Richard Ross was an officer with AFI, Director and Vice–President, and Vice–President with Kimmaren Corporation. Edward Bain, an attorney, was also the registered agent for Kimmaren and attorney for Dr. Head. In addition, he was on the Board of Directors as Acting Secretary when Raven's Hollow was incorporated. Jean Head Sisco was Dr. Head's sister.

From 1976 to 1980, AFI, which Dr. Head controlled, transferred substantial assets in excess of $3 million to the nonexempt Trust, which Dr. Head also controlled. These transferred assets were no longer carried on the books of AFI nor were the assets transferred thereafter included in the financial statements of AFI. *See e.g., Gov't. Trial Ex. 13(1)* at schedule 7, Part IV, line 3e (1976 Return of AFI showing transfer of $516,518 in securities from AFI to Airlie Trust); *Ex. 13(m)* at schedule 5, Part II and schedule 7, Part IV, Line 3e (1977 Return of AFI showing transfer of $829,555, to Airlie Trust, representing the total of cash and a note receivable from Raven's Hollow); *Trial Ex. 13(o)* at schedule III, part III, Line 21 (1979 Return of AFI showing donations of $1,234,824 from AFI to Airlie Trust). In essence, then, AFI transferred its own assets to the nonexempt Trust and thus out of its control.

In other transactions, AFI transferred real property to the trust. In May 1975, AFI purchased 452 acres of real estate, known as the "Clifton Farm," for $300,500. *AFI's A.R. no. 22* at 92. In May 1977, AFI sold the Clifton Farm to the Airlie Trust for $300,000. *Id.* at 93. In July 1977, the Airlie Trust sold the Clifton Farm to Mr. Herbert Frayer, on behalf of Mrs. Cordelia Scaife May, for one million dollars. *Id.* Mrs. May did not receive a deed to the property until 1982. *Id.*

---

5. In its examination the IRS considered the first trust, which accompanied the 1974 income tax return of Airlie Trust, as well as the statement of the trustees that also accompanied the tax return. It did not consider the second trust. AFI, in its protest letter to the IRS, contended that the operative trust document was the second trust. Under either trust document, the IRS asserts, there is inurement to Dr. Head.

Airlie Trust did not report the sale of the Clifton Farm on its income tax return, even though it had received one million dollars from the sale. Instead, AFI reported the sale on its tax return for 1977. *Gov't.Ex. 13(m)* at schedule 2 (1977 AFI tax return showing sale of Clifton Farm). By reporting the transfer from the trust to Mrs. May on AFI's tax return, AFI, an exempt organization, paid no tax on the sale and the trust, a taxable entity, did not have to pay any taxes on the one million dollars. AFI contended that the trust was acting as an agent of AFI; therefore, because AFI and the trust viewed the sale as an agency transaction, AFI reflected the sale and the gain therefrom on its tax returns for 1977. *AFI's A.R. no. 22* at 93. Moreover, AFI asserted, the sale inured to AFI's benefit because it realized a $600,500 profit on the turnover of the Clifton Farm. *Id.*

Airlie Trust attached to their 1977 U.S. Fiduciary Income Tax Return a letter from Dr. Head dated September 29, 1978, in his capacity as Executive Director of AFI. The letter stated that AFI had deeded real estate to the trust but that the trust "ultimately" paid over the entire proceeds therefrom to AFI. *Gov't. Trial Ex. 16(d)* (letter from Dr. Head). Also attached to the return was a "To Whom It May Concern" note from Airlie Trust trustees that the trust had accepted a deed from AFI and subsequently sold the real estate to Mr. Frayer, acting in a constructive trust capacity. The note went on to state that all proceeds from the sale had been turned over to AFI "which will report the entire transaction on its 1977 income tax return." *Id.* (note from Airlie Trust trustees). What neither Dr. Head's letter nor the trustees' note mentions, however, is that the trust had purchased the property from AFI, not simply accepted a deed of property.

### 5. Business Relationship between AFI and Raven's Hollow

Raven's Hollow began leasing property from AFI beginning on January 1, 1963.[6] *AFI's A.R. 22* at 72. Raven's Hollow leased a variety of land and tangible personal property from AFI: the building from which Raven's Hollow operates and the land on which such building is located (leased by AFI from Kimmaren); automobiles, trucks and other equipment (owned by AFI); until 1976, an airplane and the Airlie III (both owned by AFI); until 1976, an airstrip, airplane hangar, and two lakes adjacent to the airstrip (leased by AFI from Kimmaren); until 1979, greenhouses and related nursery equipment. *AFI's A.R. 22* at 71. At Dr. Head's criminal trials, there was some disagreement about whether the leases between Raven's Hollow and AFI were entered into as a result of arms-length bargaining. Several people testified that Dr. Head was on both sides of these transactions, while an accountant testified that the various leases were in arms-length relationship with the entities. More importantly, however, although AFI claimed that it benefitted from these leases, Raven's Hollow did not pay the rent in a timely manner. In fact, Raven's Hollow did not pay rent on the various leases from 1965 to 1977. *AFI's A.R. no. 22* at 85. On December 31, 1971, AFI converted a portion of the accrued rental payments due from Raven's Hollow into an unsecured promissory note in the amount of $190,000 at 6% interest due on November 30, 1975. *AFI's A.R. no. 22* at 85. During the course of the next few years, the value of the note was increased to $509,555, to reflect unpaid rentals, and the maturity date was changed to November 30, 1978.[7] AFI transferred the note to Airlie Trust and "new" Raven's Hollow paid the trust the total amount of the note in July 1977. As for the remainder owed to AFI, $248,497.51 and interest of $75,619.43 (total of $324,116.94), AFI forgave $33,671 of interest and accepted payment for the balance.

When it was discovered that Raven's Hollow would show a profit for a year, AFI would backdate some of the lease agreements to increase the rent expense of Raven's Hollow so that its taxable income would be reduced or eliminated. *See e.g., Head I, vol. XVII* at 907–908 (testimony of Robert

---

6. Neither the leases nor the existence of Raven's Hollow as a provider of services to AFI were described in AFI's application for exempt status.

7. In its protest, AFI notes that in June 1973, Raven's Hollow paid $25,000 on the note.

Thomas Curtis, former comptroller/accountant at AFI, regarding backdating leases); *Head II, vol. XIII* at 44–49 (testimony of Norvel James, comptroller of Raven's Hollow and AFI until 1977, regarding backdating leases). No tax consequences would flow from the increase in rent income to AFI because it was an exempt organization. Raven's Hollow, in turn, benefitted by not having to pay taxes.

Another way in which Raven's Hollow and Dr. Head benefitted from the operation of AFI was in the creation of a cash fund which Dr. Head controlled. Raven's Hollow billed AFI for expenses of its film crews. Norvel James, who kept the books for Raven's Hollow and AFI, testified that Raven's Hollow then created duplicate invoices for travel per diem that had already been paid by AFI. *Head I, vol. I* at 148–175. Charles Francis, former president of Raven's Hollow, testified that he would make up a voucher for a film trip and have the crew chief endorse it. Mr. Francis would sign the check and give it to Mr. James who would then cash the check. Mr. James then gave the money back to Mr. Francis. After this transaction, Mr. Francis would give the money to Dr. Head, who kept it or later put it in a safe at Raven's Hollow. Norvel James testified that Raven's Hollow claimed business deductions for these false invoices. *Head II, vol. XIII* at 6–11, 19.

Funds accumulated as a result of the false invoices, totalling between $80,000 and $90,000. *Head II, vol. XV* at 105 (Mr. Francis testified that there was roughly $90,000 cashed in phony checks and given to Dr. Head). Dr. Head testified that he controlled the money; it was "in my custody." *Head II, vol. XVIII* at 223–224. Between $20,000 and $25,000 of this cash fund was placed into certificates of deposit in his name and in Eve Jarvis' name, his girlfriend. *Gov't. Trial Ex. M5a, M7, M4* (deposit slips dated 1977 and 1978); *Gov't Ex. 23(k)* at 25 (grand jury testimony of Eve Jarvis); *Head II, vol. XVI-*

II at 46 (testimony of Eve Jarvis), at 174–79 (Dr. Head's testimony regarding the cash fund); *Head II, vol. XVI* at 147–60 (testimony of Eve Jarvis). Dr. Head testified that he kept no records of how this money was used. Dr. Head later returned $78,000 of the money to AFI, after the criminal case.[8]

Dr. Head testified that he received a management fee from the new Raven's Hollow in excess of $50,000. *Head II, vol. XVIII* at 86, 222. AFI now claims that this must be a reference to a fee from Kimmaren, not Raven's Hollow. According to a management agreement between Dr. Head and Kimmaren, he was to receive a management fee of $12,000 annually, plus the first $25,000 of net income.

Raven's Hollow also benefitted from Dr. Head's relationship with others. Mr. Herbert Frayer was personal financial advisor to Mrs. Cordelia May beginning in 1974 and also became a trustee on the board of the Cordelia Scaife May trusts in 1977. Mr. Frayer was a friend of Dr. Head. As a result of these two relationships and Dr. Head's control over AFI, Raven's Hollow benefitted financially. Ultimately, though, Airlie Trust benefitted as well.

In February of 1974, Mr. Frayer obtained a $25,000 bank loan from the Fauquier National Bank, which was personally guaranteed by Dr. Head. At Dr. Head's suggestion, four months into the two-year loan, Mr. Frayer accepted a consulting fee for $25,600 drawn on the account of Raven's Hollow, which was the amount owed at that time on the bank loan. Although Dr. Head testified that he had gotten business and tax advice from Mr. Frayer, Mr. Frayer admitted to the grand jury that he had not performed any consulting services to Raven's Hollow or to AFI to justify the $25,600 fee. *Gov't. A.R. no. 23(h)* at 20–29.

Raven's Hollow initially had insufficient funds to pay the fee. According to AFI, Dr.

---

8. Dr. Head had control over other money sources. A bank account called the special account was opened in the name of AFI. Richard Ross testified before the grand jury that Dr. Head controlled the special account "personally" and "exclusively." *Gov't. Ex. 23(p)* at 42–43. AFI also paid for the legal fees incurred by Dr. Head

in connection with defense to the criminal indictment and ensuing trials and appeals. The sum paid totalled more than $100,000 as of June 15, 1979. *Gov't. Ex. 2 doc. L* (letter from Dr. Head to Board of Directors regarding payment of legal fees); *Exs. 27–32* (bills for legal fees).

Head asked Raven's Hollow whether AFI owed it for any unbilled expenditures, which, if billed and paid, would generate funds allowing Raven's Hollow to pay Mr. Frayer for consulting services equal to the amount of the loan due. *AFI's A.R. 22* at 95–96. After billing AFI and receiving payment, Raven's Hollow then was able to issue two checks to Mr. Frayer, equal to the amount of his loan. *Id.* at 96. Without payment from AFI, Raven's Hollow would not have been able to pay the fee.

Subsequently, "New" Raven's Hollow was formed in May, 1977, ("old" Raven's Hollow had dissolved) and was authorized to sell stock to raise capital. Mrs. May ·owned a corporation named Roldiva, Inc. In July 1977, Roldiva purchased 50% of Raven's Hollow's stock, on the advice of Mr. Frayer, which amounted to $800,000. At the time, Mr. Frayer knew that Raven's Hollow was insolvent. The $800,000 was transferred through the bank account of Mr. Frayer.

With this infusion of funds, "New" Raven's Hollow began to pay off the "old" corporation's debts. Raven's Hollow paid AFI $290,445 on its account, and AFI then transferred $290,000 to the Airlie Trust. AFI, in turn, forgave $33,672 in accrued interest to June 1, 1977, "because of the unlikelihood of repayment." *AFI's A.R. no. 22* at 86. AFI had transferred the "old" corporation's promissory note for $509,555 to the trust; Raven's Hollow paid that amount, then, directly to the trust. Thus, the entire $800,000 from Mrs. May ended up in the nonexempt trust, even though the rent due was owed to AFI.

Raven's Hollow also benefitted from transfers of property. In 1974, AFI acquired 53.18 acres of real estate known as the Blackwell property. On May 24, 1977, Kimmaren Corporation authorized Dr. Head, its president, to purchase 50% of the outstanding stock of Raven's Hollow. Prior to purchasing the Raven's Hollow stock, Kimmaren

Corporation and AFI exchanged parcels of land: AFI transferred the Blackwell property to Kimmaren and Kimmaren transferred a 53 acre parcel of land to AFI. Four days later, on July 14, 1977, Kimmaren Corporation, acting through Dr. Head, transferred the Blackwell property, originally held by AFI, to Raven's Hollow in exchange for 500 shares of stock (representing 50% ownership) in Raven's Hollow. The stocks were valued at $800,000.

No appraisals of the property transferred or. received by AFI were prepared, and no evidence exists to show that the trades were for equal value. In fact, AFI's return for 1977 shows a land asset value at the beginning of the year as $289,750 but at the end of the year the value is $83,080. *Gov't. Trial Ex. 13(m)* at·Part II, line 31 (1977 Return of AFI, Form 990).

### III.

*Preliminary Issues*

Both AFI and the government raise issues which must be resolved before the summary judgment motion can be reviewed.[9]

#### A. *AFI's arguments*

The Court has already determined that the administrative record does include the criminal trial transcripts of Dr. Murdock Head as well as the grand jury materials as these were relied on by the IRS and were incorporated by reference in AFI's protest and in written correspondence between the IRS and AFI. *See* August 21 Order at 6–7; *see also* Tax Ct.R. 210(b)(10). In a new twist on an old argument, AFI argues that the testimony and exhibits from Dr. Murdock Head's criminal trials provide no support for the Government's summary judgment motion. First, AFI asserts that the criminal trial materials relate to a different time period than is relevant here. As the government admits, the

---

9. The Government argues that the Court's remand to the IRS was improper, citing *Contemporary Mission, Inc. v. United States*, 229 Ct.Cl. 745, 1982 WL 25945 (1982). *Contemporary Mission*, however, is not on point. In that case, the Court denied the plaintiff's request for a remand to the IRS for reconsideration of the agency's adverse determination. The Court determined that plain-

tiff could present the same evidence before the court in a trial that the plaintiff would have presented to the IRS upon reconsideration. Here, the Court's remand was not for reconsideration by the IRS of its revocation decision, but for an enunciation of the facts which the IRS relied upon for its conclusions that revocation was appropriate.

**546**

relevant time period for the revocation decision is 1976 to 1980. AFI argues that the relevant time period for the prosecution of Dr. Head, according to the indictment, was prior to January 1, 1976.

In the "Objects of the Conspiracy" section of the indictment, it states:

Beginning in or about September 1967 and continuing through in or about August 1977, the exact dates being to the Grand Jury unknown ... MURDOCK HEAD did unlawfully, wilfully and knowingly combine, conspire, confederate and agree with Airlie Foundation, Raven's Hollow ... unindicted co-conspirators herein ... to commit offenses against the United States of America ...

While there is some overlap of time, more importantly, as the evidence discussed *supra* shows, several of the events that occurred prior to 1976 and which were listed in the indictment had reverberations in subsequent years. For example, listed in the "Means and Methods of the Conspiracy" section of the indictment are references to the leases between Raven's Hollow and AFI (*Gov't. Ex. 3* at ¶ 4) and the payment of fees to Mr. Herbert Frayer which the IRS alleges later influenced Mr. Frayer's advice to a major contributor to Raven's Hollow (*Id.* at ¶¶ 15, 16, 17).

■ Second, AFI argues that the criminal case materials are "clearly hearsay" as to it, unless a particular exception overcomes their hearsay character. Certified transcripts of prior testimony may be used to support a motion for summary judgment when they are relevant. *See International Distributing Corp. v. American Dist.*, 569 F.2d 136, 138 (D.C.Cir.1977) citing 6 Moore, *Federal Practice*, (2 ed. 1976). In addition, under Fed.R.Evid. 804(b)(1), former testimony is permitted if the party against whom the testimony is now offered, "or, in a civil proceeding, a predecessor in interest," had an opportunity and similar motive to develop the testimony. AFI was not only an unindicted

co-conspirator in Dr. Head's criminal trials, but Dr. Head controlled AFI. As such, AFI had an opportunity and similar motive as Dr. Head to develop the testimony at the criminal trials. In the alternative, the criminal case materials fall within the residual exception to the hearsay rule, Fed.R.Evid. 803(24)[10], or, within Fed.R.Evid. 801(d)(2), admissions of a party-opponent, when the testimony of employees of AFI is proffered. The criminal case materials are admissible against AFI.[11]

AFI also argues that an affidavit of Leon Avery, IRS field officer, confirming what materials he reviewed, cannot be used to support a motion for summary judgment because it contains no claim of personal knowledge as to any fact other than that the affiant received certain documents. However, the function of the Avery Affidavit is not to resolve an issue of genuine fact but to state what information and documents Mr. Avery as an Exempt Organization Specialist reviewed for this case. In essence, Mr. Avery's Affidavit describes what is contained in the administrative record. Although sworn or certified copies were not attached to Mr. Avery's Affidavit when it was filed as a supplement to Defendant's Motion for Summary Judgment as required by Fed. R.Civ.P. 56(e), certified copies were attached to the motion itself.

■ Third, AFI argues that the "assortment of unauthenticated documents" are clearly inadmissible because they are without foundation; therefore, they are inadequate to support a motion for summary judgment. Government Exhibits 1 A.R. nos. 1 through 21, 25, 26, and 27 and Exhibits 12 through 38 are documents that government counsel obtained from the administrative file. *Declaration of government counsel* at ¶ 2. The transcripts of the criminal trials are in certified form, certified copies having been obtained from the Clerk, United States District Court for the Eastern District of Virginia, Alexandria Division. *Id.* Finally, Exhibits 3, 4, 5,

10. As required by the rule, the government notified AFI in March, 1991, that it would seek to introduce the criminal trial testimony and exhibits pursuant to Fed.R.Evid. 803(24).

11. The Court also notes that as part of the administrative record, the criminal trial materials are also offered to show what the IRS relied on to make its determination. As such, the material is not hearsay.

6, 7, 8, and 11 are also in certified form, each having been certified by the Clerk of the appropriate district court. *Id.* The government also points out that most of the documents are records of AFI.

These exhibits and transcripts are a part of the administrative record. In a declaratory judgment action under 26 U.S.C. § 7428, the Court is to review the administrative record, which includes among others "all documents submitted to the [IRS] by the applicant . . . all protests and related papers submitted to the [IRS] . . . [and] all pertinent returns filed with the IRS." *See* Tax Ct.R. 210(b)(10) (definition of administrative record). Additionally, most of the documents, as listed *supra,* are certified by the appropriate district court, satisfying any issues of authenticity. Finally, use of "prior trial testimony and exhibits is proper in summary judgment cases." *Bost Athletic Ass'n. v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989) (citation omitted).

Finally, AFI contends that while the government relies on AFI's Admissions (Gov't. Exhibit 2), these Admissions do not by themselves resolve any material fact. While they do authenticate some documents, AFI argues that they are as supportive of its position as that of the government; summary judgment, then, is not appropriate where contradictory inferences may be drawn from undisputed facts. All reasonable inferences from the facts are to be drawn in favor of the non-movant on a motion for summary judgment. That rule, however, does not mean that the government may not rely in its motion for summary judgment on AFI's Admissions. The question before the Court is whether these Admissions and the other evidence presented resolve material facts such that only issues of law remain.

In summary, the government has made an appropriate record for summary judgment.

### B. *Government's arguments*

■ The government argues that it is not limited to the grounds identified by the IRS in the TAM or the compliance document filed with the Court in October 1992 because this is a *de novo* proceeding. Instead, the government contends, its Statement of Material Facts is the basis for its motion. The government asserts that it may rely on the facts underlying issues 8, 9, and 10 of the TAM, even though the IRS determined that these issues were not a basis for revocation of AFI's tax-exempt status. Issues 8 through 10 dealt specifically with transactions between AFI and Raven's Hollow that occurred prior to January 1, 1970. The IRS' conclusion regarding these pre–1970 transactions reads as follows:

> Inasmuch as section 503 of the Code, as it applies to organizations described in section 501(c)(3), was made inapplicable by virtue of the provisions of the Tax Reform Act of 1969, we have concluded that it is not applicable to the facts presented.

TAM at 11.[12]

AFI asserts, however, that because the Government failed to plead any new grounds, it has waived its rights to assert such new grounds. *See Aero Rental v. Commissioner,* 64 T.C. 331, 338, 1975 WL 3043 (1975) (issues raised for first time by brief not properly before the court; by not raising new issues, issues are waived). Specifically, AFI argues, issues 8 through 10 and the "potential for abuse" argument involving AFI and Raven's Hollow, which AFI contends was raised for the first time in summary judgment, cannot be relied upon by the government because the IRS did not rely upon these as a basis for revocation.

The IRS based its decision to revoke AFI's exempt status in part on the conclusion that AFI was serving the private interests of its founder and executive director, Dr. Head. *See* TAM at 10–11. While the IRS ultimately did not rely on Issues 8 through 10 for revocation, this was not a decision on the merits that all transactions between Raven's Hollow and AFI were exempt. A fair reading of the TAM makes clear that the IRS was relying on transactions between AFI and Raven's Hollow in making its revocation deci-

---

**12.** The IRS also decided that there was no basis to conclude that AFI had jeopardized its tax-exempt status by making valuable improvements on the real estate which is owned by Airlie Farm, the subject of Issue 2. TAM at 10.

sion. *See* TAM at 5 (describing Raven's Hollow's lease of 200 acres from AFI, the use of the boat, and the Florida apartment) and at 9 (discussing how Dr. Head's private interests were served through the use of the boat, the apartment, and business relationship which existed between AFI and Raven's Hollow). The IRS concluded that

> [t]he evidence indicates that Mr. [sic] Head treated the Foundation as merely one part of his financial empire and utilized it for the private benefit of himself and his family. The cumulative effect of the transactions described above is that the Foundation was not operated exclusively for one or more exempt purposes since it was operated to a substantial extent for the benefit of private interests as opposed to the benefit of the public.

TAM at 11.

■ Therefore, the government has not asserted any affirmative defenses nor raised any grounds for revocation other than those grounds relied upon by the IRS in the final TAM. The Court's scope of review, then, is confined to the administrative record and the IRS' conclusions and grounds for those conclusions that revocation of AFI's exempt status was warranted. *See Basic Unit Ministry of Alma Karl Schurig v. United States,* 511 F.Supp. 166, 168 (D.D.C.1981), *aff'd,* 670 F.2d 1210 (D.C.Cir.1982). The Court, however, may make findings of fact which differ from the administrative record. Tax Ct.R. 217(b); *see also Animal Protection Institute v. United States,* 42 A.F.T.R.2d (P–H) 78–5850, 5854, 1978 WL 4201 *6 (Cl.Ct.1978).

## IV.

On a motion for summary judgment, the movant bears the burden of establishing that there is no material fact in dispute and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party opposing the motion has the burden of showing that there is a genuine issue of material fact in dispute. In reviewing a summary judgment motion, courts consider whether the material facts necessary for decision have been adequately developed and "whether further litigation would put the

parties to unnecessary expense and would also waste judicial resources." *Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987). Unless the non-movant advances a plausible argument, evidence or averment that would create a genuine issue of material fact and justify a trial, the motion will be granted. *Id.* at 584; *see also Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (rule mandates entry of summary judgment against party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial).

In a declaratory action following a revocation proceeding, the plaintiff, here AFI, bears the burden of proof in showing that it is entitled to tax exempt status. *See* Tax Ct.R. 217(c)(2)(i) ("The burden of proof shall be upon the petitioner as to jurisdictional requirements and as to the grounds set forth in the notice of determination."); *Animal Protection,* 42 A.F.T.R.2d at 78–5854. Because the defendant relies in its motion on the same reasons given in the TAM, "the burden is upon the plaintiff to show that defendant's determination is wrong." *Basic Unit Ministry,* 511 F.Supp. at 168 (citation omitted). As AFI is the non-movant, it is entitled to all justifiable inferences. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citation omitted). However, as the party bearing the burden of proof at trial, AFI may not rest upon "mere allegations or denials," but must come forth with specific facts showing that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

## V.

### A. *Exempt Organizations*

■ Certain organizations are exempted from taxation by Internal Revenue Code § 501(c)(3) when those organizations are

> organized and operated exclusively for religious, charitable .... or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, ...

26 U.S.C. § 501(c)(3). To qualify for an exemption, an organization must be both organized and operated exclusively for one or more exempt purposes. The government concedes that AFI is organized for an exempt purpose, but argues, however, that AFI has not operated in an exempt manner. An incidental non-exempt purpose will not disqualify an organization, but a single substantial non-exempt purpose or activity will destroy the exemption, regardless of the number or quality of exempt purposes. *Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945).

To satisfy the "operational test," an organization must meet four requirements: (1) the organization must "engage primarily in activities which accomplish one or more of the exempt purposes specified in § 501(c)(3);" (2) "the organization's net earnings may not inure to the benefit of private shareholders or individuals;" (3) the organization must not engage in substantial political or lobbying activities; and (4) the organization "must serve a valid public purpose and confer a public benefit." *Church of Scientology v. Commissioner*, 823 F.2d 1310, 1315 (9th Cir.1987), *cert. denied*, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (citations omitted); *Freedom Church of Revelation v. United States*, 588 F.Supp. 693, 696 (D.D.C.1984) (organization must prove (1) that it is "operated exclusively" for tax exempt purposes and (2) that "no part of its net earnings inured to the benefit of any private individual."). Failure to comply with any one of these four elements comprising the "operational test" will cause the organization to lose its eligibility for tax exempt status. *Church of Scientology*, 823 F.2d at 1315.

The IRS based its revocation decision that AFI did not operate exclusively for an exempt purpose on two factors. First, the IRS found that AFI did not operate exclusively for an exempt purpose because it operated a commercial enterprise. The IRS determined that AFI was operating its conference center as a commercial enterprise, either as a hotel or as a resort, and that a primary aim of AFI was to generate revenue from the conference center. *See* TAM, Issue 1. However, prior to this determination, the IRS had examined AFI's exempt status on three occasions, specifically reviewing the operation of the conference center. On each of those occasions, the IRS determined that AFI was entitled to continued tax exempt status. The last such examination occurred in September, 1976. The Court finds, after reviewing the evidence presented by the IRS and AFI, that whether AFI operated its conference center as a commercial enterprise is a question of fact. The Court, therefore, denies the government's summary judgment motion on this issue.

Second, the IRS found that AFI operated to a substantial extent for the benefit of Dr. Head and his family as opposed to the benefit of the public and that a part of AFI's earnings inured to the benefit of Dr. Head, as well as to his family. The Court grants the government's motion on this ground.

B. *Personal Inurement*

To be eligible for exempt status, "no part of an organization's net earnings may inure to the benefit of any private shareholder or individual." *See Freedom Church of Revelation v. United States*, 588 F.Supp. 693, 698 (D.D.C.1984) (the amount or extent of the inurement or benefit is not relevant). "Private shareholder or individual" is broadly defined as any person "having a personal and private interest in the activities of the organization" and it includes the creator of the organization and his family. *See Presbyterian and Reformed Publishing Co. v. Commissioner*, 743 F.2d 148, 153 (3rd Cir.1984), citing 26 C.F.R. § 1.501(a)–1(c) (1984). In addition, an organization is not operated exclusively for exempt purposes if it serves a private rather than a public interest. *Easter House v. United States*, 12 Cl.Ct. 476, 487 (1987), citing Treas.Reg. § 1.501(c)(3)–1(d)(1)(ii), *aff'd without opinion*, 846 F.2d 78 (Fed.Cir.1988).

Courts have broadly construed the term "net earnings," including "more than gross receipts minus disbursements as shown on the books of the organization." *Church of Scientology*, 823 F.2d at 1316; *Church of Transfiguring Spirit v. Commissioner*, 76 T.C. 1, 6, 1981 WL 11377 (1981) (net earnings may inure to an individual "in ways other

than a distribution of dividends or excessive salaries.") (citations omitted). Payment of excessive salaries or unaccounted for diversions of an organization's resources "by one who has complete and unfettered control can constitute inurement." *Church of Scientology*, 823 F.2d at 1316; *see also Church by Mail, Inc. v. United States*, 88–2 U.S.T.C. (CCH) ¶ 9625, 85,987, 1988 WL 129725 (D.D.C.1988) (although it may be difficult for the IRS and the court to precisely trace the flow of funds from source to destination to determine whether excessive compensation is inurement, control over the organization can create a "potential for abuse") (Oberdorfer, J.). Similarly, earnings may inure to an individual when a particular individual or limited number of individuals "reap commercial benefits from the operation of the instrumentality, though they do not do so by direct acquisition or payment over to them of its earnings." *Harding Hospital v. United States*, 505 F.2d 1068, 1072 (6th Cir.1974) citing 6 Mertens, *Law of Income Taxation*, § 34.13, at 63 (1968 ed.).

The potential for abuse may also exist when the founder of an exempt organization also controls other non-exempt entities and those entities interact, if the exempt entities operate to benefit the non-exempt entities. *See International Postgraduate Medical Foundation v. Commissioner*, 56 T.C.M. (CCH) 1140, 1144, 1989 WL 3808 (1989) (when a for-profit enterprise benefits substantially from the activities of an exempt organization, the exempt organization is not operated exclusively for exempt purposes); *Western Catholic Church v. Commissioner*, 73 T.C. 196, 214, 1979 WL 3850 (1979) (when exempt organization's investments are dictated in part by needs of private interests, one cannot say that organization was operated exclusively for public benefit). Indeed, while separate requirements, the "private inurement" and the "operated exclusively for exempt purposes" tests often substantially overlap. *See Transfiguring Spirit*, 76 T.C. at 5 (petitioner must establish that it is not organized or operated for the benefit of private interests such as those of its founder or his family) (citations omitted).

The plaintiff bears the burden of proof to demonstrate that insiders do not benefit from the tax-exempt organization, "especially where the facts indicate transactions arguably not on arm's length terms." *Orange Co. Agricultural Society, Inc. v. Commissioner*, 893 F.2d 529, 534 (2d Cir. 1990) (citations omitted). Where there is evident potential for abuse, as when one individual controls the organization, plaintiff must "openly and candidly disclose all facts bearing upon the operation and the finances of the organization." *Bubbling Well Church v. Commissioner*, 74 T.C. 531, 535, 1980 WL 4453 (1980), *aff'd*, 670 F.2d 104 (9th Cir. 1981); *see also Church of Scientology*, 823 F.2d at 1317 (citation omitted).

## C. *Discussion*

This case is about Dr. Head's financial empire and the various transactions within that empire that benefitted him and his family. This empire was centered around the activities of an exempt organization and was fueled by abuses of that exempt organization for personal inurement and private benefit.

The facts are overwhelming that Dr. Head controlled AFI, Raven's Hollow, and Kimmaren/Airlie Farms. Dr. Head also exercised control over the Airlie Trust, regardless of which document is used, because he had the power to replace Trustees. By controlling each of these organizations, Dr. Head was able to manipulate the funds and assets of AFI, as well as to use AFI's exempt status, to benefit the non-exempt entities and himself.

### 1. Condominium

AFI asserts that the condominium and Airlie III [13] were part of a plan to expand and diversify its operations to include a Florida base: "Airlie South." AFI wanted to fulfill several grants to study water-related pollution problems and various issues related to the United States and Latin America, as well as to tap in to a substantial collection of potential donors in the south Florida area, all of which required trips back and forth to Florida. The condominium, AFI contends,

---

**13.** The Court finds that how the Airlie III was used is a question of fact.

was used as a center for fundraising efforts in Florida, as well as a retreat center for Airlie's creative efforts and hotel facility while producing films or in transit. *AFI's A.R. 22* at 87; *see also Schryver Aff.* at ¶¶ 14–15 (affidavit of Paul Schryver, legal counsel for AFI and Dr. Head in Florida). All of these uses, AFI argues, were for AFI business.

There is no log showing how the condominium was used, but AFI has presented sworn testimony that it was used for business purposes. AFI has not rebutted the evidence, however, that the condominium did not appear on its books as an asset after Dr. Head transferred it in 1976 and claimed a tax deduction. AFI has also not rebutted the evidence that Dr. Head retained control of the condominium after claiming the deduction. Therefore, AFI has not met its burden of showing that Dr. Head did not use AFI for his personal benefit through the use of the condominium. *See Western Catholic Church,* 73 T.C. at 214 (founder used the exempt organization as an "incorporated pocketbook," transferring excess personal funds and claiming tax deductions while retaining complete control over the funds, using them for nonexempt purposes). Thus, Dr. Head's use of the condominium inured to his benefit.

### 2. Airlie Trust

It is undisputed that AFI transferred assets to the separate, nonexempt trust. This transfer alone, the IRS contends, justified revocation of AFI's tax-exempt status. In addition, transferring assets to an entity controlled by Dr. Head constitutes inurement of the assets of AFI to Dr. Head, the IRS asserts. Under either trust, the grantor (Dr. Head) acting in conjunction with the directors of AFI (who were controlled by Dr. Head) could dispose of the trust corpus and use the proceeds to purchase land owned by Airlie Farm (which was owned by the partnership of Dr. and Mrs. Head). Thus, the government argues, the trust provided a source of funds for the sale of substantial real estate owned by Dr. Head.

Finally, according to the government, regardless of which trust document is used, the trust served the personal interests of Dr. Head and constituted inurement of income to him.[14] In the first trust, Dr. Head's income interest, gauged to the size of the corpus, coupled with the substantial dollar amounts of transferred AFI assets, served his personal interest because the trust provided for life income to Dr. Head. The second trust, with the provision allowing Dr. Head to determine his own compensation, constituted inurement of income to him as well.

AFI argues that the trust exists solely to benefit the Foundation and that no one but the Foundation can benefit from it. As long as AFI exists, it is the beneficiary of the trust. When AFI ceases to exist, George Washington University is the residual beneficiary. Further, AFI argues, the trust's power to buy AFI's leasehold can only be at the Foundation's direction and for its benefit; it is a grant of power, not obligation. Anyone could buy the fee interest in AFI's leasehold, subject to the advantage created for the Foundation by the leasehold, AFI asserts.

AFI contends that Dr. Head never received any funds or other inurement from the trust nor could he in the future. Also, Dr. Head never served as a trustee of the trust. *AFI's A.R. 22* at 88–89 n. 34, 90. In addition, AFI dismisses the passing of assets to the trust as being of no moment. It asserts that the trust merely served as a holder of an investment portfolio for the Foundation.

Although AFI is entitled to all reasonable inferences that the money and securities that AFI deposited to the trust were used for an exempt purpose, it has not presented any evidence to support any such inferences. Given Dr. Head's control over AFI and the trust, the massive influx of money and marketable securities into the trust, and the lack of any real evidence submitted by AFI that these transfers served an exempt purpose, the Court finds that AFI was not operating for an exempt purpose when it transferred assets to the trust.

---

14. The government suggests that while the second version of the trust was recorded, under Virginia law a trust need not be recorded to be effective.

In addition, AFI has not met its burden of showing that the sale of the Clifton Farm property by AFI to the trust and then the subsequent sale by the trust to Mr. Frayer (and Mrs. May) did not inure to the benefit of the non-exempt trust and Dr. Head. AFI claims that the trust was acting as its agent in selling the property to Mr. Frayer; thus, the trust did not pay any taxes on the million dollar sale. According to AFI's own protest document, though, the trust owned Clifton Farm when it sold the farm to Mrs. May. Also, Mr. Frayer's check for one million dollars was paid directly to the trust. AFI's tax return did reflect a gain from the sale which supports AFI's claim that it received the proceeds of the sale. However, AFI has not met its burden of showing that the transactions were proper agency transactions and not done for a nonexempt purpose such as allowing the trust to avoid paying taxes on the sale.

### 3. Business Relationship between AFI and Raven's Hollow

Raven's Hollow, a non-exempt organization controlled by Dr. Head, benefitted in a variety of ways from the operation of AFI. In fact, Dr. Head essentially admitted at his criminal trial that without AFI, Raven's Hollow would not have existed. Dr. Head controlled Raven's Hollow and he controlled AFI. By controlling AFI, Dr. Head could ensure that Raven's Hollow would receive work and that rent could be accrued. AFI argues that Raven's Hollow was a not-for-profit company and thus, there could be no helping of a for-profit company. However, Raven's Hollow was non-exempt and as Dr. Head admitted, would not have existed without AFI.

First, it is undisputed that various leases between Raven's Hollow and AFI were backdated and increased when there was the likelihood that Raven's Hollow would show a profit at the end of the year. AFI argues that it benefitted from an increase in the rents. However, by backdating the leases so that Raven's Hollow could avoid paying tax, AFI was operating to benefit Raven's Hollow. In addition, Raven's Hollow did not pay the rent in a timely manner. Allowing Rav-

en's Hollow to accumulate rent helped it to remain a viable company. Also, by forgiving $33,671 in interest, AFI was helping Raven's Hollow. Therefore, AFI was not operated for an exempt purpose because it provided a private benefit to Raven's Hollow. *See Orange County*, 893 F.2d at 534 (court found private inurement and private benefit when an exempt organization loaned money to a for-profit organization controlled by the exempt organization's largest shareholders and, while some of the loans were repaid, the total amount never was); *Easter House*, 12 Cl.Ct. at 488 (organization was not exempt because it provided a source of loans to other organizations that were non-exempt and all the organizations were controlled by the same person).

Second, Raven's Hollow, and more specifically Dr. Head, benefitted from the film work that it did for AFI. AFI reimbursed Raven's Hollow employees for their expenses when involved in work for AFI. However, in spite of this reimbursement, Raven's Hollow created a system of false vouchers for the very same expenses. Raven's Hollow used its own funds to pay these vouchers and then claimed business deductions for these false invoices. Dr. Head received the money from the false vouchers and used it for his own purposes. Although this money did not come directly from AFI, the false voucher system functioned because AFI paid the legitimate vouchers.

Third, Raven's Hollow was able to obtain substantial funding due to Dr. Head's control over AFI. Dr. Head's relationship with Mr. Frayer turned out to be quite profitable for Raven's Hollow. Because Dr. Head controlled both AFI and Raven's Hollow, he was able to transfer funds so that Mr. Frayer could be paid for "consulting work," although Mr. Frayer himself admitted that he had not performed any consulting services. Subsequently, Mr. Frayer advised Mrs. May to invest $800,000 in new Raven's Hollow, even though the company was insolvent at the time.

Raven's Hollow also obtained substantial funding as a result of a transfer of land between AFI and Kimmaren. The two organizations exchanged parcels of land roughly

equal in size: AFI transferred the Blackwell property to Kimmaren in return for another parcel of land. No appraisals of either parcel of land were apparently prepared. However, Kimmaren subsequently exchanged the Blackwell property for $800,000 worth of stock in Raven's Hollow, while AFI's return for 1977 shows a decline in land asset value for the year. As the IRS contends, the ultimate effect of the transfer of land between Kimmaren and AFI was that Raven's Hollow received the Blackwell Property, apparently at a loss to AFI.

### VI.

*Conclusion*

The government has marshalled an impressive array of undisputed facts showing how the network of organizations controlled by Dr. Head operated to his benefit. AFI, on the other hand, has not produced any evidence that Dr. Head or his family did not benefit from the various transactions.

The government need only show that AFI has not met one of the requirements of being a tax exempt organization. Given Dr. Head's control of AFI, Raven's Hollow and Kimmaren, the various transfers of money and land among the organizations and to others, the trust, the cash fund, the condominium, and the lack of any evidence presented by AFI that Dr. Head or his family did not benefit, the Court finds that AFI was not operated exclusively for an exempt purpose but for the private benefit of Dr. Head and his family. AFI has also not met its burden of showing that no part of its net earnings inured to Dr. Head or to his family. *See Easter House*, 12 Cl.Ct. at 487 (plaintiff must prove eligibility for exemption by proving no inurement to private shareholders or no serving of a private benefit).

Therefore, for the reasons set forth in this opinion, the Court grants summary judgment for the government. The government shall submit an appropriate order to the Court within 10 days of the filing of this opinion.