**THE FUND FOR THE STUDY OF ECOMOMIC GROWTH AND TAX REFORM, Plaintiff,**

**v.**

**INTERNAL REVENUE SERVICE, Defendant.**

**No. CIV.A. 97–0747(RMU).**

United States District Court, District of Columbia.

Feb. 12, 1998.

William James Lehrfeld, Washington, DC, for Plaintiff.

Stuart David Gibson, U.S. Dept. of Justice, Tax Div., Washington, DC, for Defendant.

## MEMORANDUM OPINION

### Granting Defendant's Motion for Summary Judgment

URBINA, District Judge.

Plaintiff, The Fund for the Study of Economic Growth and Tax Reform (Fund), pursuant to 26 U.S.C. § 7428, seeks a declaratory judgment that it is a tax exempt organization under § 501(c)(3) of the United States Internal Revenue Code. Defendant, Internal Revenue Service (IRS), denied the Fund tax exempt status because it did not operate exclusively for "charitable purposes" within the meaning of § 501(c)(3). Further, the IRS found that plaintiff is an "action" organization and therefore barred from federal tax exemption. Treas. Reg. § 1.501(c)(3)–1(c)(3). Upon a consideration of the Stipulated Administrative Record, the cross motions for summary judgment filed herein, the court concludes that the IRS properly determined the Fund did not qualify for tax-exempt status and accordingly affirms its decision.

## I. BACKGROUND

### A. Description of the Plaintiff Fund

In 1995, Senate Majority Leader Bob Dole and Speaker of the House Newt Gingrich created the National Commission for the Study of Economic Growth and Tax Reform (Commission). *AR 76.* The Commission's task was to prepare a Final Report and make recommendations on reforming the tax code. *AR 73.* Senator Dole and Speaker Gingrich appointed the members of the Commission including Jack Kemp as Chairman, and Edwin Feulner as Vice Chairman. *AR 59.* Mr. Kemp and Mr. Feulner headed an all-Republican group selected from various fields and committees such as members of Congress, representatives from the business sector and public policy makers. *AR 1750.*

In order to finance the Commission's work, Mr. Kemp established the plaintiff Fund by executing a charitable trust agreement and designated himself as the grantor as well as a one of the trustees. *AR 1741* [1] The trust

---

1. According to the record, the Fund "is a legal entity which supports the National Commission of Economic Growth and Tax Reform." AR 1741.

instrument provides that the plaintiff shall be organized and operated "exclusively for charitable purposes, including the advancement of education within the meaning of Internal Revenue Code ("IRC") § 501(c)(3)." *Complaint,* ¶ *18.* The trust instrument further provides that plaintiff "shall fund the study, research and analysis of ideas and proposals to reform the nation's tax system and to spur economic growth in the United States by reducing the tax burden on individuals and businesses." *Id.* ¶ *8.* The trust instrument also provides that any net earning shall not benefit any private individual, nor shall any activities conducted pursuant to the trust agreement consist of promoting propaganda, or attempting to influence legislation or participate in any political campaign. *Compl.* ¶ *27.* The plaintiff is authorized to conduct nonpartisan studies and to research the nation's economic growth through tax reform, and to publicly disclose any results of such studies.

The Fund's primary purpose was to raise funds for the Commission's work. *AR 20, 1741–43.* The Commission solicited and received financial contributions for the Fund and reported them as donations to the IRS. *AR 1806.* In letters of solicitation, both Mr. Feulner and Mr. Kemp wrote to prospective contributors to the Fund and expressed the importance of the Fund's existence for the work of the Commission.[2] Mr. Kemp's letters to prospective donors on behalf of the Commission did not include a statement regarding the possibility of tax exempt status for deductibility purposes. *AR 825–828.* In fact, Mr. Kemp's letters announced the fact that the organization is "entirely dependent on voluntary contributions, with not a penny

from the government to support our work." *AR 827.*

## B. Activities of the plaintiff Fund

The activities of the plaintiff Fund consisted of public hearings across the country, and various publications including the Final Report of the Commission.[3] The funded presentations focused on reforming the present tax system into a flat tax and how to achieve such a goal. *AR 75–103.* Much of the testimony at the earlier hearings was directed at mobilizing efforts to change the tax laws.[4] The Commission did not study alternatives to a complete revamping of the system such as making modifications to the present Code or retaining the current system of taxation. Discussions or presentations dedicated to views other than a flat tax are absent in the record.[5] Upon completion of its hearings, the Commission published its Final Report, which began with a Foreword written by Senator Dole and Speaker Gingrich and opening remarks from Jack Kemp. *AR 1268.* Mr. Kemp's remarks stated that the Commission was appointed to study the current tax code and "submit to Congress our recommendations for tax reform." *AR 1270.* The crux of the Final Report was a recommendation to Congress to repeal the tax code in its entirety. *AR 1835.*

## C. Procedural context

On June 12, 1995, plaintiff applied to the IRS for tax-exempt status under IRC § 501(c)(3). In support of its application to the IRS for tax-exempt status, the plaintiff submitted newspaper accounts describing the activities of the Fund and reporting on the objectives of the Fund. *AR 1348–1365.* Con-

---

2.  "I want you to know the critical role that [the Fund] has played in the national debate over tax policy during this critical election year…We believe that the fundamental conditions of the Commission will guide the debate over tax reform throughout this campaign year. Then we hope tax reform can be the first major issue considered by the new Congress with the President in early 1997." *AR 1741.*

3.  While the Commission held eight hearings, the Administrative record only contains complete transcripts from two of those, one in Washington, DC and the other in Los Angeles. *AR75–103* and *AR 598–658.*

4.  "But we do have to build consensus. And the first thing we have to do is build a consensus within our majority in the congress." Congressman Archer's testimony, June 28, 1995 hearing. *AR 82.*

5.  In fact the record shows that certain views were excluded from the "public" hearings. Professor Harl, who offered an alternative perspective on tax reform, was not allowed to present his remarks to the Commission, despite the fact he was originally invited. *AR 1651.*

**18**

sistently, these press reports identified the Commission as "Republican" or the "GOP Commission" or "GOP Panel".[6] After over a year of supplemental submissions to the IRS office in support of its exemption application, the defendant issued an "initial adverse ruling". The defendant found that plaintiff did not operate in a manner consistent with § 501(c)(3) because of the "private benefit conferred on the Republican Party and its candidates." *Id.*

After the denial of tax exempt status, and during the appeal process, the plaintiff Fund requested additional time to file its administrative protest because Mr. Kemp resigned as trustee and soon after was nominated as the Republican Vice–Presidential candidate for the 1996 election. *AR 174.* At a hearing on November 8, 1996, the plaintiff protested the adverse ruling by submitting more supplemental materials describing the activities of plaintiff. However, on January 27, 1997, the defendant issued a final adverse ruling with respect to plaintiff's application for exemption from federal income taxation under § 501(c)(3). *AR 1834.* The IRS based its decision on two grounds that: (1) plaintiff was operated for a substantial non-exempt purpose; and (2) plaintiff qualified as an "action organization" within the meaning of Treas. Reg. § 1.501(c)(3)–1(c)(3)(iv) of the federal income tax regulations. *AR 1834– 1835.*

Plaintiff's complaint requests this court to review the defendant's decision to deny tax exempt status for the plaintiff trust and declare that plaintiff qualifies as a tax exempt organization under § 501(c)(3). *Compl. ¶ 12.* Also, plaintiff requests that the court declare plaintiff a publicly supported organization under IRC § 509(a)(1), rather that an "action organization" as determined by the IRS. *Id.* Consequently, the plaintiff filed a motion for summary judgment pursuant to 26 U.S.C. § 7428. Additionally, plaintiff filed a motion to strike material outside the administrative record. The court addresses each motion in turn.

## II.  Discussion

### A.  Scope of Review

▮    An action for declaratory judgment under 26 U.S.C. § 7428 confers concurrent jurisdiction to the Court for Federal Claims, the United States Tax Court and the District Court to review a final determination by the Secretary of Treasury regarding the tax exempt status of an organization under § 501(c)(3). The standard of review is *de novo* and the scope of review is limited to the administrative record unless good cause is shown. *Basic Unit Ministry of Alma Karl Schurig v. United States,* 511 F.Supp. 166, 167–168 (D.D.C.1981), *aff'd* 670 F.2d 1210 (D.C.Cir.1982). "The court, however, may make findings of fact which differ from the administrative record." *Airlie Foundation, Inc. v. United States,* 826 F.Supp. 537, 547 (D.D.C.1993). Courts reviewing a final determination of tax exempt status by the IRS are to consider the overall picture presented by the administrative record. *Dumaine Farms v. Commissioner,* 73 T.C. 650, 1980 WL 4510 (1980).

### B.  Defendant's Motion to Strike

▮   Defendant initially moves this court to strike certain appendices (Nos.1–8, 11–16) included in plaintiff's opposition to defendant's motion for summary judgment as extraneous and irrelevant evidence. These appendices contain the following information *not* contained in the Stipulated Administrative Record including: (1) information about other organizations that are exempt under 501(c)(3); (2) information about certain individuals related to the Commission; and (3) Internet media reports.

The court grants defendant's motion to strike material outside the record. *See Schurig v. United States,* 511 F.Supp. 166 (D.D.C.1981). Tax Court Rule 217(a) provides that "only with the permission of the court, upon good cause shown, will any party be permitted to introduce any evidence other than that presented before the IRS and contained in the administrative record as so defined." *Nationalist Movement v. IRS,* 37 F.3d 216 (5th Cir.1994). The plaintiff has

---

**6.** Administrative Record at 1347, 1348, 1349,     1351, 1352, 1354, 1357, 1364, 1365, 1367.

failed to show good cause by attempting to introduce items solely for purposes of offering a broader context for the court's decision. *Plaintiff's Opposition to Defendant's Motion to Strike, pg. 4.* The Administrative Record (over 1800 pages) is more than sufficient to assist the court in its decision. Therefore, because the parties have stipulated to the Administrative Record, and plaintiff has not met its burden to show good cause why the court should expand its review of the record, the defendant's motion to strike is granted.

### C. Motion for Summary Judgment

When considering a motion for summary judgment, "the movant bears the burden of establishing that there is no material fact in dispute and that it is entitled to judgment as a matter of law." *Airlie,* 826 F.Supp. at 547, *quoting Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the motion has the burden of showing that there is a genuine issue of material fact in dispute. *Id.* Moreover, in reviewing § 7428 actions, the court's focus should be on whether the IRS's administrative determination was proper in light of the law and facts in the record. *Houston Lawyer Referral Service, Inc. v. IRS,* 69 T.C. 570, 1978 WL 3279 (1978). Further, the taxpayer, in this case the plaintiff Fund, maintains the burden of proof to show that it is entitled to the tax exempt status and therefore that the Internal Revenue Service's determination was incorrect. *Airlie, 826 F.Supp. at 547.* Thus, while the court must review the IRS's determination *de novo,* the organization still carries the burden of demonstrating that it has met the requirement of the statute under which it claims tax exemption. *Church of the Visible Intelligence that Governs the Universe v. United States,* 4 Cl.Ct. 55, 60 (1983).

The IRS's final determination to deny the Fund tax exempt status was based on the following two grounds:

1) the Fund is not operated exclusively for charitable purposes within the meaning of section 501(c)(3). It is operated for a substantial nonexempt purpose.

2) The Fund is an "action" organization within the meaning of section 1.501(c)(3)-(c)(3)(iv) of the Federal income tax regulation.

In addition, the IRS treated the Fund and the Commission as one entity for purposes of review. This court agrees with the IRS analysis and finds that due to the fact that the Fund exclusively supported the Commission, the activities of the Commission should be attributed to the Fund.

### 1. Exempt Organizations under IRC § 501(c)(3)

▮ Under § 501(c)(3), organizations are entitled to federal tax exemption if they are:

1) organized and operated exclusively for exempt purposes (i.e. religious, charitable, educational purposes) and

2) no part of the net earnings benefits any private shareholder or individual,[7] and

3) no substantial part of the organization's activities consist of carrying on propaganda, or otherwise attempting to influence legislation, and

4) it must not participate in any political campaigns. 26 U.S.C. § 503(c)(3).

Looking to the first requisite for exemption, an organization must be *both* organized *and* operated for one or more exempt purposes. If an organization fails to meet either prong, it cannot be exempt under 503(c)(1). 26 C.F.R. 1.501(c)(3)–1(a)(1). An organization is "operated exclusively" for exempt purposes if it engages in primarily exempt activities. If, however, the organization's activities involve substantially non-exempt purposes, no tax exemption applies. *Id.* It is settled law that an "incidental non-exempt purpose will not disqualify an organization, but a single substantial non-exempt purpose or activity will destroy the exemption, regardless of the number or quality of exempt purposes." *Airlie,* 826 F.Supp. at 548, citing *Better Business Bureau v. U.S.,* 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945).

▮ There is no dispute that the plaintiff is organized for an exempt purpose on the

---

**7.** While the IRS concluded, "that the creation of the Commission and its report were intended to confer a substantial private benefit on the Repub- lican party and its candidates" the Final Adverse determination only relied on the two grounds discussed below. *AR 759.*

face of its trust instrument. However, controversy arises under the second requirement which mandates that the organization be operated for exempt purposes.

Plaintiff asserts that its efforts were charitable and educational because its activities advanced the public interest and awareness of the dysfunctional nature of the Internal Revenue Code. Therefore, plaintiff asserts, it was not operated for substantially non-exempt purposes, since the public hearings and final report facilitated public education, rather than political agitation. Further, plaintiff maintains that it cannot be classified as an "action" organization precluding tax exemption.

Defendant posits that the plaintiff indeed supported a partisan and a politically motivated Commission. The defendant also asserts that the activities of the Commission were substantially non-exempt because they existed primarily for the advancement of the Republican political agenda with regard to tax reform. Moreover, the defendant claims that the Commission's activities cannot be classified as "educational" because the Commission advocated for a political change that may only be attained by influencing legislation.

Courts have long held that government should not subsidize partisan, political advocacy under the guise of educational activities. *Taxation with Representation of Washington v. Regan,* 676 F.2d 715, 736 (D.C.Cir. 1982). Taxpayers should not subsidize efforts at political advocacy or lobbying. *Christian Echoes National Ministry v. United States,* 470 F.2d 849 (10th Cir.1972) (*emphasis in original*); *see also, Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). "The limitations in section 501(c)(3) stem from congressional policy that the United States Treasury should be neutral in political affairs and that substantial activities directed to attempts to influence legislation or affect a political campaign should not be subsidized." *Christian Echoes,* 470 F.2d at 854.

Plaintiff's application for tax exemption states that it "intends to foster public discourse and debate regarding the issues of tax reform, economic growth and the private sec-

tor's role in enhancing such growth," by undertaking certain activities. These activities included:

1) funding "the study, research and analysis of ideas and proposals to reform the Nation's tax system and to spur economic growth in the United States..."

2) providing grants to non-partisan individuals and entities to research and analyze data on whether and to what extent the present tax system burdens economic growth...

3) preparing reports available for public dissemination...

4) providing funding for "the public dissemination of its research and analysis and do so by sponsoring lectures, seminars and publications." *AR 17.*

Finally, the plaintiff's application states that it will not undertake any formal marketing or advertising, but instead, it believes that "interested members of the public shall be made aware of its publications through media coverage of the tax reform debate and of its activities." *AR 19.* The court will address each of these objectives separately.

First, the plaintiff claims that its purpose is to fund the study and research of proposals for tax reform. Despite these claims, only a single concept is analyzed—the complete overhaul of the tax code with a view towards a single flat tax rate, precisely the goal of the Commission.

Second, while the Fund's objectives included providing grants to non-partisan entities including educational and scientific institutes, the Fund actually only supported the efforts of the Commission. In fact, the Fund's trust arrangement demonstrated a direct connection between the trustees of the Fund and the grantees of the funds. While the plaintiff stated to the IRS that "none of its grantees shall be related to its trustees", the record says otherwise. The only "grantee" to receive funds was the Commission, whose Chairman and Vice–Chairman were two of the Fund's three trustees. *AR 17.* Clearly, an umbilical relationship existed between the Fund and the Commission's activities.

Third, while the Fund organized public hearings throughout the country, the record

shows that these were conducted to advance a particular political message and to support for a cornerstone of the Republican agenda in the 1996 elections.[8] In addition, the message of mobilizing the majority in Congress (a Republican Congress) to achieve a tax reform was clearly enunciated by speakers at the hearings and culminated in the Commission's Final Report.

Finally, two other important indicators factor into the court's decision. One is the nature of the press accounts describing the Commission's activities. The Commission admittedly relied on the press for marketing and advertising of its objectives and disseminating its proposed recommendation. The court, as did the IRS, considers those press releases and newspaper accounts in examining the Fund's tax exempt status.

The press uniformly referred to the Commission as the "GOP Commission" or the "Republican tax reform commission." The Commission never denied this characterization. The record is replete with examples that the Commission advocated a legislative agenda that favored the repeal of the current tax code, and the installation of a "flat tax."

The court also considers the timing of the entire matter. The Commission began April 3, 1995 and ended January 17, 1996. The Fund was established June 7, 1995. The life span of the Commission lasted not more than a year—the year before the 1996 Presidential elections. During the relevant time period the Fund operated in a political environment laden with tax reform issues.

In view of all these factors, as amply reflected in the Administrative Record, the court finds that the Fund clearly supported a one-sided political agenda and did not "operate exclusively" for non-exempt purposes under § 503(c)(1). Therefore, based on the thrust and focus of the Commission's activities, and the fact that the Fund solely funded such efforts, the court concludes that the IRS properly denied the Fund tax exempt status. Accordingly, the court affirms the decision of the IRS.

## 2. "Action organization" under § 1.501(c)(3)–1(c)(3)

In addition to finding that the plaintiff operated for non-exempt purposes, the IRS also found that plaintiff qualified as an "action organization." This is a separate basis for denying tax exempt status. The Department of Treasury promulgated regulations to assist in determining when an organization crosses the line from "educational" and enters the prohibited world of lobbying and political advocacy. Under Treas. Regs. § 1.501(c)(3)–1(c)(3), such an organization is identified as an "action organization" and is not entitled to a federal tax exemption. An "action organization" has two characteristics: (1) its primary objective may only be attained through legislation; and (2) it advocates, or campaigns for, the attainment of such a primary objective as distinguished from engaging in nonpartisan analysis, study, or research and making the results thereof available to the public. "In determining whether an organization has such characteristics, all the surrounding facts and circumstances, including the articles and all activities of the organization, are to be considered." Treas. Regs. § 1.501(c)(3)–1(c)–(3).

The record supports a finding that the plaintiff operated as an "action organization" within the meaning of the § 1.501(c)(3) regulations. The same activities described in the previous section can also be considered in determining whether the Fund serves as an action organization. The two-part test is satisfied here. The first prong is satisfied because the plaintiff concedes that the only way of achieving the Commission's policies is through legislative reform. Therefore, the court need only examine the second prong of the test: whether the Commission "advocates, or campaigns for, the attainment of such main or primary objective, as distinguished from engaging in nonpartisan, study, analysis or research and making the results thereof available to the public." The Treasury Regulation, § 1.501(c)(3)–1(c)(3)(ii) pro-

---

8. "And if Mr. Dole, now the likely GOP presidential nominee, enthusiastically campaigns on the commission's plan, it is going to make him our next president." Washington Times, January 22, 1996. *AR 1365.*

vides that attempting to influence legislation shall include urging the public to contact members of a legislative body for the purpose of proposing, supporting or opposing legislation. "The fact that specific legislation was not mentioned does not mean that these attempts to influence public opinion were not attempts to influence legislation." [9]

The Administrative Record contains credible examples of the Commission's advocacy and lobbying efforts for tax reform through legislative means. The Commission's Director of Research, Mr. Alan Reynolds, described the Commission by saying: "it does not pretend to be a non-partisan commission. Tax reform is inherently political." *AR 1601*.[10] The Final Report's Foreword contains a "Letter to the American People" from Senator Dole and Speaker Gingrich which indicated that the report "will surely serve as a catalyst for congressional hearings and debate." *AR 1272–73*. Chairman Kemp's Introduction indicated that the Commission was created "to study the current tax code, listen to the suggestions and ideas of people around the country, and submit to Congress our recommendations for comprehensive reform...not merely to offer superficial reforms... but to begin with a *tabula rasa* and map out a totally new tax structure for America's next century." *AR 1270*. The Final Report (1) calls upon Congress and the President to reject any tax reform proposals that do not conform to the recommendations of the Commission's Final Report and (2) urges the president to appoint a commission to take the recommendations of the Final Report to the next level. *AR 1272–1273*. Significantly, the Final Report encourages the American people to "use the goals and guidelines we offer as a road map through the coming national debate on tax reform." *AR 1272*. In his letter to donors, the Vice Chairman stated that the Final Report "will

guide the debate over tax reform throughout this campaign year." *AR 1741*.

Judging from these as well as the numerous press releases and reports regarding the political agenda of the Commission and the Fund that supports it, the IRS did not err in declaring that the plaintiff Fund and Commission were actively engaged in advocacy and the furthering of a particular political agenda. Accordingly, the court concludes that the evidence on the record supports a finding that the plaintiff is an "action organization" and is therefore barred from the privilege of tax exemption.

## III. Conclusion

After reviewing the administrative record the court determines that the IRS had a proper basis for denying tax exempt status to the plaintiff. In this case, the court considered the quantity of activities with a non-exempt purpose, the quality of those activities, the actual or perceived partisanship of the activities, the overt partisan statements of the members of the Commission as well as the creators of the Fund. Taking all the circumstances into consideration, the court affirms the IRS's determination that plaintiff engaged in substantial non-exempt activities and that the plaintiff functioned as an "action organization," and is therefore prohibited from federal tax exemption.

**9.** *Christian Echoes Nat. Ministry, Inc. v. United States,* 470 F.2d 849 (10th Cir.1972) (affirming the revocation of organization's tax exempt status).

**10.** The article proceeded to state: "Republican observers say the commission's findings will carry significant weight because the panel was formed by Gingrich and Dole. Democrats say that the panel was exclusively a Republican exercise and that the results will mean little to them." *AR 1601*.